5/19/2021 3:52:40 PM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **19-5807.pdf** | versus | **19-5807_new2.pdf** |
| **58 pages (316 KB)** | | **58 pages (319 KB)** |
| 5/17/2021 11:59:10 AM | | 5/19/2021 3:36:32 PM |

| Total Changes | Content | | Styling and Annotations | |
|---|---|---|---|---|
| **2** | 1 | Replacement | 0 | Styling |
| | 0 | Insertions | 0 | Annotations |
| | 1 | Deletion | | |

Go to First Change (page 1)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## EDWARDS *v.* VANNOY, WARDEN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 19–5807. Argued December 2, 2020—Decided May 17, 2021

In 2007, a Louisiana jury found petitioner Thedrick Edwards guilty of armed robbery, rape, and kidnapping. At the time, Louisiana law permitted non-unanimous jury verdicts if at least 10 of the 12 jurors found the defendant guilty. In Edwards's case, 11 of 12 jurors returned a guilty verdict as to some crimes, and 10 of 12 jurors returned a guilty verdict as to others. After Edwards's conviction became final on direct review, Edwards filed a federal habeas corpus petition, arguing that the non-unanimous jury verdict violated his constitutional right to a unanimous jury. The District Court rejected Edwards's claim as foreclosed by *Apodaca* v. *Oregon*, 406 U. S. 404, and the Fifth Circuit denied a certificate of appealability. While Edwards's petition for a writ of certiorari was pending, the Court repudiated *Apodaca* and held that a state jury must be unanimous to convict a criminal defendant of a serious offense. *Ramos* v. *Louisiana*, 590 U. S. \_\_\_. Edwards now argues that the *Ramos* jury-unanimity rule applies retroactively on federal collateral review.

*Held*: The *Ramos* jury-unanimity rule does not apply retroactively on federal collateral review. Pp. 5–20.

(a) A new rule of criminal procedure applies to cases on *direct* review, even if the defendant's trial has already concluded. But the Court has stated that new rules of criminal procedure ordinarily do not apply retroactively on federal *collateral* review. The Court has stated that a new procedural rule will apply retroactively on federal collateral review only if the new rule constitutes a "watershed" rule of criminal procedure. *Teague* v. *Lane*, 489 U. S. 288, 311 (plurality opinion). When the *Teague* Court first articulated that "watershed" exception, however, the Court stated that it was "unlikely" that such watershed "components of basic due process have yet to emerge." *Id.,* at 313. And

in the 32 years since *Teague*, the Court has *never* found that any new procedural rule actually satisfies the purported exception.  Pp. 5–7.

   (b) To determine whether *Ramos* applies retroactively on federal collateral review, the Court must first ask whether *Ramos* announced a new rule of criminal procedure and, if so, whether that rule falls within an exception for watershed rules of criminal procedure that apply retroactively on federal collateral review.  The Court concludes that *Ramos* announced a new rule and that the jury-unanimity rule announced by *Ramos* does not apply retroactively on federal collateral review.  Pp. 8–14.

      (1) The *Ramos* jury-unanimity rule is new because it was not "*dictated* by precedent existing at the time the defendant's conviction became final," *Teague*, 489 U. S., at 301, or "apparent to all reasonable jurists" at that time, *Lambrix* v. *Singletary*, 520 U. S. 518, 528.  On the contrary, before *Ramos*, many courts interpreted *Apodaca* to allow for non-unanimous jury verdicts in state criminal trials.  And the *Ramos* Court expressly repudiated *Apodaca*.  Pp. 8–10.

      (2) The new rule announced in *Ramos* does not qualify as a "watershed" procedural rule that applies retroactively on federal collateral review.  In an attempt to distinguish *Ramos* from the long line of cases where the Court has declined to retroactively apply new procedural rules, Edwards emphasizes three aspects of *Ramos*: (i) the significance of the jury-unanimity right; (ii) *Ramos*'s reliance on the original meaning of the Constitution; and (iii) the effect of *Ramos* in preventing racial discrimination in the jury process.  But the Court has refused to retroactively apply other momentous cases with similar attributes.  In *DeStefano* v. *Woods*, 392 U. S. 631, the Court declined to retroactively apply *Duncan* v. *Louisiana*, 395 U. S. 145, even though *Duncan* established the jury right itself.  In *Whorton* v. *Bockting*, 549 U. S. 406, the Court declined to retroactively apply *Crawford* v. *Washington*, 541 U. S. 36, even though *Crawford* relied on the original meaning of the Sixth Amendment to restrict the use of hearsay evidence against criminal defendants.  And in *Allen* v. *Hardy*, 478 U. S. 255 (*per curiam*), the Court declined to retroactively apply *Batson* v. *Kentucky*, 476 U. S. 79, even though *Batson* held that state prosecutors may not discriminate on the basis of race when exercising individual peremptory challenges. There is no good rationale for treating *Ramos* differently from *Duncan*, *Crawford*, and *Batson*.  Pp. 10–14.

      (3) Given the Court's numerous precedents holding that landmark and historic decisions announcing new rules of criminal procedure do not apply retroactively on federal collateral review, the Court acknowledges that the watershed exception is moribund and that no new rules of criminal procedure can satisfy the purported exception for watershed rules.  Continuing to articulate a theoretical exception that never

actually applies in practice offers false hope to defendants, distorts the law, misleads judges, and wastes the resources of defense counsel, prosecutors, and courts. Moreover, no one can reasonably rely on an exception that is non-existent in practice, so no reliance interests can be affected by forthrightly acknowledging reality. The watershed exception must "be regarded as retaining no vitality." *Herrera* v. *Wyoming*, 587 U. S. \_\_\_, \_\_\_ (slip op., at 11) (internal quotation marks omitted). Pp. 14–15.

Affirmed.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., THOMAS, ALITO, GORSUCH, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. GORSUCH, J., filed a concurring opinion, in which THOMAS, J., joined. KAGAN, J., filed a dissenting opinion, in which BREYER and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 19–5807

### THEDRICK EDWARDS, PETITIONER *v.* DARREL VANNOY, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 17, 2021]

JUSTICE KAVANAUGH delivered the opinion of the Court.

Last Term in *Ramos* v. *Louisiana*, 590 U. S. \_\_\_ (2020), this Court held that a state jury must be unanimous to convict a criminal defendant of a serious offense. *Ramos* repudiated this Court's 1972 decision in *Apodaca* v. *Oregon*, 406 U. S. 404, which had allowed non-unanimous juries in state criminal trials. The question in this case is whether the new rule of criminal procedure announced in *Ramos* applies retroactively to overturn final convictions on federal collateral review. Under this Court's retroactivity precedents, the answer is no.

This Court has repeatedly stated that a decision announcing a new rule of criminal procedure ordinarily does not apply retroactively on federal collateral review. See *Teague* v. *Lane*, 489 U. S. 288, 310 (1989) (plurality opinion); see also *Linkletter* v. *Walker*, 381 U. S. 618, 639–640, and n. 20 (1965). Indeed, in the 32 years since *Teague* underscored that principle, this Court has announced many important new rules of criminal procedure. But the Court has not applied *any* of those new rules retroactively on federal collateral review. See, *e.g., Whorton* v. *Bockting*, 549

U. S. 406, 421 (2007) (Confrontation Clause rule recognized in *Crawford* v. *Washington*, 541 U. S. 36 (2004), does not apply retroactively). And for decades before *Teague*, the Court also regularly declined to apply new rules retroactively, including on federal collateral review. See, *e.g., DeStefano* v. *Woods*, 392 U. S. 631, 635 (1968) (*per curiam*) (jury-trial rule recognized in *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), does not apply retroactively).

In light of the Court's well-settled retroactivity doctrine, we conclude that the *Ramos* jury-unanimity rule likewise does not apply retroactively on federal collateral review. We therefore affirm the judgment of the U. S. Court of Appeals for the Fifth Circuit.

I

On the night of May 13, 2006, in Baton Rouge, Louisiana, Thedrick Edwards and an accomplice kidnapped Ryan Eaton, a student at LSU. As Eaton was getting out of his car, Edwards and his accomplice confronted Eaton at gunpoint and forced him back into the car. Edwards and his accomplice then jumped into the car with Eaton. They drove with Eaton to an ATM where they hoped to withdraw money using Eaton's card. When they discovered that Eaton did not have any money in his account, they drove to Eaton's apartment. Once there, they bound and blindfolded Eaton, rummaged through his apartment, and took some of his belongings to Eaton's car.

After they were back in the car, Edwards and his accomplice coerced Eaton into arranging a meeting with Eaton's girlfriend. They then drove to the girlfriend's apartment and, at gunpoint, forced Eaton to knock on the door. When Eaton's girlfriend opened the door, Edwards and his accomplice rushed inside. Both Edwards and his accomplice were armed, and Edwards's accomplice had his gun drawn. Edwards and his accomplice instructed Eaton, Eaton's girlfriend, and two other women in the apartment to lie on the

floor. Edwards then raped one of the women. His accomplice raped another woman. As they left, they grabbed some personal property from the apartment. Edwards and his accomplice hurried back into Eaton's car and drove around the corner. They then abandoned the car and fled.

Two days later, Edwards and his accomplice confronted another man at gunpoint and forced him to withdraw money from an ATM.

Within a day of the second incident, the police collected substantial evidence implicating Edwards in both episodes. The police obtained warrants to search his residence and to arrest him. The day after the police executed the search warrant but before an arrest, Edwards turned himself in to the police and confessed to his crimes. The police videotaped Edwards's confession. (The video is part of the joint appendix. See supremecourt.gov/media/media.aspx.)

Edwards was indicted in Louisiana state court for armed robbery, kidnapping, and rape. Edwards pled not guilty and went to trial. Before trial, Edwards moved to suppress the videotaped confession on the ground that the confession was involuntary. The trial court denied the suppression motion.

At trial, the jury heard Edwards's confession and other evidence against him, including the testimony of eyewitnesses. The jury convicted Edwards of five counts of armed robbery, two counts of kidnapping, and one count of rape. At the time, Louisiana law permitted guilty verdicts if at least 10 of the 12 jurors found the defendant guilty. The jury convicted Edwards by an 11-to-1 vote on one of the armed robbery counts, the two kidnapping counts, and the rape count. The jury convicted Edwards by a 10-to-2 vote on the four remaining armed robbery counts.

At sentencing, the trial judge stated: "I can say without hesitation that this is the most egregious case that I've had before me." Record 1113. The judge sentenced Edwards to

life imprisonment without parole. The Louisiana First Circuit Court of Appeal affirmed the conviction and sentence. In March 2011, Edwards's conviction became final on direct review.

After his conviction became final, Edwards applied for state post-conviction relief in the Louisiana courts. The Louisiana courts denied relief.

In 2015, Edwards filed a petition for a writ of habeas corpus in the U. S. District Court for the Middle District of Louisiana. He argued that the non-unanimous jury verdict violated his constitutional right to a unanimous jury. The District Court rejected that claim as foreclosed by this Court's 1972 decision in *Apodaca* v. *Oregon*, 406 U. S. 404.

In *Apodaca*, this Court ruled that the Constitution does not require unanimous jury verdicts in state criminal trials. The *Apodaca* majority consisted of a plurality opinion by four Justices and an opinion concurring in the judgment by Justice Powell. In his opinion, Justice Powell acknowledged that the Sixth Amendment requires a unanimous jury in *federal* criminal trials. 406 U. S., at 371. But in his view, the Fourteenth Amendment did not incorporate that right against the States, meaning that a unanimous jury was not constitutionally required in *state* criminal trials. *Id.*, at 373, 376–377. In subsequent years, many federal and state courts viewed Justice Powell's opinion as the controlling opinion from *Apodaca*. See, *e.g., Timbs* v. *Indiana*, 586 U. S. ___, ___, n. 1 (2019) (slip op., at 3, n. 1); *McDonald* v. *Chicago*, 561 U. S. 742, 766, n. 14 (2010).

In Edwards's case, the District Court likewise followed Justice Powell's opinion from *Apodaca* and concluded that a unanimous jury is not constitutionally required in state criminal trials. The U. S. Court of Appeals for the Fifth Circuit denied a certificate of appealability. 2019 WL 8643258 (May 20, 2019). Edwards then petitioned for a writ of certiorari in this Court, arguing that the Constitution requires a unanimous jury in state criminal trials.

## II

While Edwards's petition for certiorari was pending, this Court decided *Ramos* and rejected Justice Powell's opinion in *Apodaca*. See *Ramos* v. *Louisiana*, 590 U. S. ___ (2020); *Apodaca* v. *Oregon*, 406 U. S. 404 (1972). The Court held that the Fourteenth Amendment incorporates the Sixth Amendment right to a unanimous jury against the States. Therefore, in state court as well as federal court, a jury must be unanimous to convict a defendant of a serious offense.[1]

The Court's decision in *Ramos* directly affected Louisiana and Oregon, which were the only two States that still allowed non-unanimous juries. For those States, this Court's decision in *Ramos* immediately triggered a pressing question: Does *Ramos* apply retroactively to overturn final convictions on federal collateral review? We granted certiorari in Edwards's case to decide that question. 590 U. S. ___ (2020). We conclude that *Ramos* does not apply retroactively on federal collateral review.

## A

A new rule of criminal procedure applies to cases on *direct* review, even if the defendant's trial has already concluded. See *Griffith* v. *Kentucky*, 479 U. S. 314, 328 (1987). But under the habeas corpus statute as interpreted by this Court, a new rule of criminal procedure ordinarily does not apply retroactively to overturn final convictions on federal *collateral* review. See *Teague* v. *Lane*, 489 U. S. 288, 310 (1989) (plurality opinion); *Penry* v. *Lynaugh*, 492 U. S. 302,

---

[1] *Ramos* does not apply to defendants charged with petty offenses, which typically are offenses that carry a maximum prison term of six months or less. 590 U. S., at ___, n. 7. (slip op., at 3, n. 7); see also *Blanton* v. *North Las Vegas*, 489 U. S. 538, 543 (1989) (defining petty offense).

313–314 (1989).[2]

In stating that new procedural rules ordinarily do not apply retroactively on federal collateral review, *Teague* reinforced what had already been the Court's regular practice for several decades under the retroactivity standard articulated in *Linkletter* v. *Walker*, 381 U. S. 618 (1965). *Linkletter* set forth a balancing test for determining retroactivity. But even under *Linkletter*, "new rules that constituted clear breaks with the past generally were not given retroactive effect," including on federal collateral review. *Teague*, 489 U. S., at 304 (plurality opinion).

As the Court has explained, applying "constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system." *Id.*, at 309. Here, for example, applying *Ramos* retroactively would potentially overturn decades of convictions obtained in reliance on *Apodaca*. Moreover, conducting scores of retrials years after the crimes occurred would require significant state resources. See *Teague*, 489 U. S., at 310 (plurality opinion). And a State may not be able to retry some defendants at all because of "lost evidence, faulty memory, and missing witnesses." *Allen* v. *Hardy*, 478 U. S. 255, 260 (1986) (*per curiam*) (internal quotation marks omitted). When previously convicted perpetrators of violent crimes go free merely because the evidence needed to conduct a retrial has become stale or is no longer available, the public suffers, as do the victims. See *United States* v. *Mechanik*, 475

---

[2] Before *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), the Court sometimes would decline to apply new procedural rules even to cases on *direct* review. See, *e.g.*, *Johnson* v. *New Jersey*, 384 U. S. 719, 721 (1966) (rule announced in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), applies only to cases in which the trial began after the date of the *Miranda* decision). *Griffith* ended that practice and declared that new rules apply to all cases on direct review.

U. S. 66, 72 (1986). Even when the evidence can be reassembled, conducting retrials years later inflicts substantial pain on crime victims who must testify again and endure new trials. In this case, the victims of the robberies, kidnappings, and rapes would have to relive their trauma and testify again, 15 years after the crimes occurred.

Put simply, the "costs imposed upon the States by retroactive application of new rules of constitutional law on habeas corpus thus generally far outweigh the benefits of this application." *Sawyer* v. *Smith*, 497 U. S. 227, 242 (1990) (internal quotation marks and alteration omitted). For that reason, the Court has repeatedly stated that new rules of criminal procedure ordinarily do not apply retroactively on federal collateral review.

The Court has identified only one possible exception to that principle. The Court has stated that a new procedural rule will apply retroactively on federal collateral review only if it constitutes a "watershed" rule of criminal procedure. *Teague*, 489 U. S., at 311 (plurality opinion). But the *Teague* Court stated that it was "unlikely" that such watershed "components of basic due process have yet to emerge." *Id.,* at 313; see also *Whorton* v. *Bockting*, 549 U. S. 406, 417 (2007); *Schriro* v. *Summerlin*, 542 U. S. 348, 352 (2004); *Tyler* v. *Cain*, 533 U. S. 656, 667, n. 7 (2001). And in the 32 years since *Teague*, as we will explain, the Court has *never* found that any new procedural rule actually satisfies that purported exception.[3]

_____

[3] By contrast, a new *substantive* rule—for example, a rule that particular conduct cannot constitutionally be criminalized—usually applies retroactively on federal collateral review. See *Welch* v. *United States*, 578 U. S. 120, 128–129 (2016). The parties here agree, as do we, that the rule announced in *Ramos* is procedural. The *Ramos* rule affects "only the manner of determining the defendant's culpability," not the "range of conduct or the class of persons that the law punishes." *Schriro* v. *Summerlin*, 542 U. S. 348, 353 (2004) (emphasis deleted).

## B

To determine whether *Ramos* applies retroactively on federal collateral review, we must answer two questions.

First, did *Ramos* announce a new rule of criminal procedure, as opposed to applying a settled rule? A new rule ordinarily does not apply retroactively on federal collateral review.

Second, if *Ramos* announced a new rule, does it fall within an exception for watershed rules of criminal procedure that apply retroactively on federal collateral review?

### 1

*Ramos* held that a state jury must be unanimous to convict a defendant of a serious offense. In so holding, *Ramos* announced a new rule.

A rule is new unless it was "*dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U. S., at 301 (plurality opinion). In other words, a rule is new unless, at the time the conviction became final, the rule was already "apparent to all reasonable jurists." *Lambrix* v. *Singletary*, 520 U. S. 518, 528 (1997). The starkest example of a decision announcing a new rule is a decision that overrules an earlier case. See *Whorton*, 549 U. S., at 416.

The jury-unanimity requirement announced in *Ramos* was not dictated by precedent or apparent to all reasonable jurists when Edwards's conviction became final in 2011. On the contrary, before *Ramos*, many courts interpreted *Apodaca* to allow for non-unanimous jury verdicts in state criminal trials.[4] In addition, in *Ramos* itself, six Members of the

---

[4] See, *e.g.*, *Timbs* v. *Indiana*, 586 U. S. ___, ___, n. 1 (2019) (slip op., at 3, n. 1) (the "Sixth Amendment requires jury unanimity in federal, but not state, criminal proceedings"); *McDonald* v. *Chicago*, 561 U. S. 742, 766, n. 14 (2010) ("The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal

Court acknowledged that *Apodaca* allowed non-unanimous jury verdicts in state criminal trials. See 590 U. S., at \_\_\_ (SOTOMAYOR, J., concurring in part) (slip op., at 2); *id.,* at \_\_\_ (KAVANAUGH, J., concurring in part) (slip op., at 1); *id.,* at \_\_\_–\_\_\_ (THOMAS, J., concurring in judgment) (slip op., at 7–8); *id.,* at \_\_\_ (ALITO, J., joined by ROBERTS, C. J., and KAGAN, J., dissenting) (slip op., at 1). And other Members of the Court recognized that *Apodaca* at least muddied the waters of the Court's Sixth Amendment jurisprudence. *Id.,* at \_\_\_, and n. 36 (plurality opinion) (slip op., at 10, and n. 36). In short, even in *Ramos* itself, the Court indicated that the decision was not dictated by precedent or apparent to all reasonable jurists.

Edwards responds that the Court's decision in *Ramos* must have applied a settled rule, not a new rule, because the decision adhered to the original meaning of the Sixth Amendment's right to a jury trial and the Fourteenth Amendment's incorporation of that right (and others) against the States. That argument conflates the merits question presented in *Ramos* with the retroactivity question presented here. On the merits question, the critical point, as the Court thoroughly explained in *Ramos*, is that the Constitution's text and history require a unanimous jury in state criminal trials. On the retroactivity question,

––––––––––

criminal trials, it does not require a unanimous jury verdict in state criminal trials"); *Schad* v. *Arizona*, 501 U. S. 624, 634, n. 5 (1991) (plurality opinion) (a "state criminal defendant, at least in noncapital cases, has no federal right to a unanimous jury verdict"); *Burch* v. *Louisiana*, 441 U. S. 130, 137 (1979) (the Court has "approved the use of certain nonunanimous verdicts in cases involving 12-person juries"); *Ludwig* v. *Massachusetts*, 427 U. S. 618, 625 (1976) (the "holding in *Apodaca*" was that "the jury's verdict need not be unanimous"); *Smith* v. *Swarthout*, 742 F. 3d 885, 895, n. 4 (CA9 2014) ("The Supreme Court has instructed that the Sixth and Fourteenth Amendments do not require a unanimous verdict in state criminal prosecutions"); see also 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §22.1(e), p. 23 (4th ed. 2015) (the "Sixth Amendment does not require jury unanimity in state criminal trials").

the critical point is that reasonable jurists who considered the question before *Ramos* interpreted *Apodaca* to allow non-unanimous jury verdicts in state criminal trials.

By renouncing *Apodaca* and expressly requiring unanimous jury verdicts in state criminal trials, *Ramos* plainly announced a new rule for purposes of this Court's retroactivity doctrine. And new rules of criminal procedure ordinarily do not apply retroactively on federal collateral review.

2

Having determined that *Ramos* announced a new rule requiring jury unanimity, we must consider whether that new rule falls within an exception for watershed rules of criminal procedure that apply retroactively on federal collateral review.

This Court has stated that the watershed exception is "extremely narrow" and applies only when, among other things, the new rule alters "our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Whorton*, 549 U. S., at 417–418 (internal quotation marks omitted).

In the abstract, those various adjectives—watershed, narrow, bedrock, essential—do not tell us much about whether a particular decision of this Court qualifies for the watershed exception. In practice, the exception has been theoretical, not real. The Court has identified only one pre-*Teague* procedural rule as watershed: the right to counsel recognized in the Court's landmark decision in *Gideon* v. *Wainwright*, 372 U. S. 335, 344–345 (1963). See *Whorton*, 549 U. S., at 419, 421. The Court has never identified any other pre-*Teague* or post-*Teague* rule as watershed. None.

Moreover, the Court has flatly proclaimed on multiple occasions that the watershed exception is unlikely to cover any more new rules. Even 32 years ago in *Teague* itself, the

Court stated that it was "unlikely" that additional watershed rules would "emerge." 489 U. S., at 313 (plurality opinion). And since *Teague*, the Court has often reiterated that "it is unlikely that any such rules have yet to emerge." *Whorton*, 549 U. S., at 417 (internal quotation marks and alteration omitted); see also *Beard* v. *Banks*, 542 U. S. 406, 417 (2004); *Summerlin*, 542 U. S., at 352; *Tyler*, 533 U. S., at 667, n. 7; *Graham* v. *Collins*, 506 U. S. 461, 478 (1993); *Sawyer*, 497 U. S., at 243; *Butler* v. *McKellar*, 494 U. S. 407, 416 (1990).

Consistent with those many emphatic pronouncements, the Court since *Teague* has rejected *every* claim that a new procedural rule qualifies as a watershed rule. For example, in *Beard* v. *Banks*, 542 U. S., at 408, the Court declined to retroactively apply the rule announced in *Mills* v. *Maryland*, 486 U. S. 367, 384 (1988), that capital juries may not be required to disregard certain mitigating factors. In *O'Dell* v. *Netherland*, 521 U. S. 151, 153 (1997), the Court refused to retroactively apply the rule announced in *Simmons* v. *South Carolina*, 512 U. S. 154, 156 (1994), that a capital defendant must be able, in certain circumstances, to inform the sentencing jury that he is parole ineligible. In *Lambrix* v. *Singletary*, 520 U. S., at 539–540, the Court declined to retroactively apply the rule announced in *Espinosa* v. *Florida*, 505 U. S. 1079, 1082 (1992) (*per curiam*), that sentencers may not weigh invalid aggravating circumstances before recommending or imposing the death penalty. In *Sawyer* v. *Smith*, 497 U. S., at 229, the Court refused to retroactively apply the rule announced in *Caldwell* v. *Mississippi*, 472 U. S. 320, 323 (1985), which prohibited a death sentence by a jury led to the false belief that responsibility for the sentence rested elsewhere.

The list of cases declining to retroactively apply a new rule of criminal procedure extends back long before *Teague* to some of this Court's most historic criminal procedure decisions. For example, in *Johnson* v. *New Jersey*, 384 U. S.

719, 721 (1966), the Court declined to retroactively apply *Miranda* v. *Arizona*, 384 U. S. 436, 444–445 (1966), which required that police inform individuals in custody of certain constitutional rights before questioning them. And in *Linkletter* v. *Walker*, 381 U. S., at 639–640, the Court refused to retroactively apply *Mapp* v. *Ohio*, 367 U. S. 643, 655 (1961), which incorporated the Fourth Amendment exclusionary rule against the States.

Edwards seeks to distinguish *Ramos* from the long line of cases where the Court has declined to retroactively apply new procedural rules. Edwards emphasizes three aspects of *Ramos*: (i) the significance of the jury-unanimity right; (ii) *Ramos*'s reliance on the original meaning of the Constitution; and (iii) the effect of *Ramos* in preventing racial discrimination in the jury process.

But Edwards's attempts to distinguish *Ramos* are unavailing because the Court has already considered and rejected those kinds of arguments in prior retroactivity cases.

*First*, Edwards emphasizes the significance of the jury-unanimity right for criminal defendants. But that argument for retroactivity cannot be squared with the Court's decisions in *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), and *DeStefano* v. *Woods*, 392 U. S. 631 (1968) (*per curiam*). In *Duncan*, the Court repudiated several precedents and ruled that a defendant has a constitutional right to a jury trial in a state criminal case. 391 U. S., at 149–150, 154–155. Notwithstanding the extraordinary significance of *Duncan* in guaranteeing a jury trial and expanding the rights of criminal defendants, the Court in *DeStefano* declined to retroactively apply the jury right. 392 U. S., at 633; see also *Summerlin*, 542 U. S., at 356–358 (relying on *DeStefano* and rejecting retroactivity of jury right recognized in *Ring* v. *Arizona*, 536 U. S. 584, 589 (2002)). We cannot discern a principled basis for retroactively applying the subsidiary *Ramos* jury-unanimity right when the Court in *DeStefano*

declined to retroactively apply the broader jury right itself.[5]

*Second*, Edwards stresses that *Ramos* relied on the original meaning of the Sixth Amendment. But that argument for retroactivity is inconsistent with *Crawford* v. *Washington*, 541 U. S. 36 (2004), and *Whorton* v. *Bockting*, 549 U. S. 406 (2007). In *Crawford*, the Court relied on the original meaning of the Sixth Amendment's Confrontation Clause to overrule precedent and restrict the use of hearsay evidence against criminal defendants. 541 U. S., at 60–69. Notwithstanding *Crawford*'s reliance on the original meaning of the Sixth Amendment, the Court in *Whorton* declined to retroactively apply *Crawford*. 549 U. S., at 421.

*Third*, Edwards says that *Ramos* prevents racial discrimination by ensuring that the votes of all jurors, regardless

———————

[5] Edwards argues that the *Ramos* rule mirrors the rule announced in *Burch* v. *Louisiana*, 441 U. S. 130, 134 (1979). In *Burch*, the Court held that six-person jury verdicts must be unanimous. According to Edwards, the Court retroactively applied *Burch* in *Brown* v. *Louisiana*, 447 U. S. 323 (1980). But the Justices who concurred in the judgment and supplied the decisive opinion in *Brown* said only that the *Burch* rule should apply to all cases on *direct* review. 447 U. S., at 337 (opinion of Powell, J., joined by Stevens, J.). They did not say that the rule should apply retroactively on federal *collateral* review. So *Brown* does not help Edwards here.

The Court's decision in *Ivan V.* v. *City of New York*, 407 U. S. 203 (1972) (*per curiam*), is no more helpful to Edwards. In *In re Winship*, the Court held that a jury must find guilt "beyond a reasonable doubt." 397 U. S. 358, 364 (1970). And in *Ivan V.*, the Court held that the rule announced in *Winship* applied in a case on *direct* review. 407 U. S., at 205. But in its numerous retroactivity cases, this Court has never identified the *Winship* rule as a watershed rule of criminal procedure that applies retroactively on federal collateral review. That no doubt explains why, in his submissions to this Court, Edwards himself did not cite *Ivan V.* in support of his retroactivity argument.

In any event, *Brown* and *Ivan V.* were pre-*Teague* decisions. See *Teague* v. *Lane*, 489 U. S. 288 (1989). Because *Teague* tightened the previous standard set forth in *Linkletter* v. *Walker*, 381 U. S. 618 (1965), for applying a decision retroactively on federal collateral review, pre-*Teague* decisions holding that a rule *is* retroactive are not as relevant as pre-*Teague* decisions holding that a rule *is not* retroactive, such as *DeStefano*.

of race, matter in the jury room. But that argument for ret-
roactivity cannot prevail in light of *Batson* v. *Kentucky*, 476
U. S. 79 (1986), and *Allen* v. *Hardy*, 478 U. S. 255 (1986)
(*per curiam*). In *Batson*, the Court overruled precedent and
revolutionized day-to-day jury selection by holding that
state prosecutors may not discriminate on the basis of race
when exercising individual peremptory challenges. 476
U. S., at 92–93, 96–98. Nonetheless, the Court in *Allen* de-
clined to retroactively apply *Batson*. 478 U. S., at 261; see
also *Teague*, 489 U. S., at 295–296 (reaffirming
*Allen*).

The Court's decisions in *Duncan*, *Crawford*, and *Batson*
were momentous and consequential. All three decisions
fundamentally reshaped criminal procedure throughout
the United States and significantly expanded the constitu-
tional rights of criminal defendants. One involved the jury-
trial right, one involved the original meaning of the Sixth
Amendment's Confrontation Clause, and one involved ra-
cial discrimination in jury selection. Yet the Court did not
apply any of those decisions retroactively on federal collat-
eral review. *Ramos* is likewise momentous and consequen-
tial. But we see no good rationale for treating *Ramos* dif-
ferently from *Duncan*, *Crawford*, and *Batson*. Consistent
with the Court's long line of retroactivity precedents, we
hold that the *Ramos* jury-unanimity rule does not apply ret-
roactively on federal collateral review.[6]

In so concluding, we recognize that the Court's many ret-
roactivity precedents taken together raise a legitimate
question: If landmark and historic criminal procedure deci-
sions—including *Mapp*, *Miranda*, *Duncan*, *Crawford*, *Bat-
son*, and now *Ramos*—do not apply retroactively on federal

_____

[6] The *Ramos* rule does not apply retroactively on *federal* collateral re-
view. States remain free, if they choose, to retroactively apply the jury-
unanimity rule as a matter of state law in state post-conviction proceed-
ings. See *Danforth* v. *Minnesota*, 552 U. S. 264, 282 (2008).

collateral review, how can any additional new rules of criminal procedure apply retroactively on federal collateral review? At this point, some 32 years after *Teague*, we think the only candid answer is that none can—that is, no new rules of criminal procedure can satisfy the watershed exception. We cannot responsibly continue to suggest otherwise to litigants and courts. In *Teague* itself, the Court recognized that the purported exception was unlikely to apply in practice, because it was "unlikely" that such watershed "components of basic due process have yet to emerge." 489 U. S., at 313 (plurality opinion). The Court has often repeated that "it is unlikely that any of these watershed rules has yet to emerge." *Tyler*, 533 U. S., at 667, n. 7 (alteration and internal quotation marks omitted); see also, *e.g., Whorton*, 549 U. S., at 417; *Summerlin*, 542 U. S., at 352. And for decades, the Court has rejected watershed status for new procedural rule after new procedural rule, amply demonstrating that the purported exception has become an empty promise.

Continuing to articulate a theoretical exception that never actually applies in practice offers false hope to defendants, distorts the law, misleads judges, and wastes the resources of defense counsel, prosecutors, and courts. Moreover, no one can reasonably rely on an exception that is non-existent in practice, so no reliance interests can be affected by forthrightly acknowledging reality. It is time— probably long past time—to make explicit what has become increasingly apparent to bench and bar over the last 32 years: New procedural rules do not apply retroactively on federal collateral review. The watershed exception is moribund. It must "be regarded as retaining no vitality." *Herrera* v. *Wyoming*, 587 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 11) (internal quotation marks omitted).

3

We respectfully offer four responses to the dissent.

*First*, in the dissent's view, if a right is important enough to justify overruling or repudiating precedent (as in *Ramos*), then it often is important enough to apply retroactively as a watershed rule of criminal procedure. But the Court's precedents say the opposite and demonstrate that the dissent's position erroneously inverts *stare decisis* and *Teague*. *Teague* recognized that the Court would occasionally announce new rules of criminal procedure by overruling or repudiating existing precedents. *Teague* further explained, however, that it was "unlikely" that such new procedural rules would apply retroactively on federal collateral review. 489 U. S., at 313 (plurality opinion). In other words, under this Court's longstanding case law, it is easier to overrule or repudiate a precedent—as the Court did in *Mapp*, *Miranda*, *Duncan*, *Batson*, and *Crawford*, for example—than it is to apply the new procedural rule retroactively on federal collateral review—as demonstrated by the Court's corresponding non-retroactivity decisions in *Linkletter*, *Johnson*, *DeStefano*, *Allen*, and *Whorton*.

The *Ramos* Court fully understood all of this. Although *Ramos* stopped short of expressly deciding this retroactivity question (because it was not squarely presented), *Ramos* discussed retroactivity and plainly foreshadowed today's decision. The lead opinion in *Ramos*—which was joined in relevant part by two of today's dissenters, JUSTICE BREYER and JUSTICE SOTOMAYOR—explained that overruling or repudiating *Apodaca* was not likely to significantly affect Louisiana's and Oregon's reliance interests in preserving final convictions because *Ramos* was not likely to apply retroactively on federal collateral review. In particular, the lead opinion said that the States' "worries" about *Ramos* applying retroactively and overturning hundreds of final convictions outstripped "the facts" because "*Teague*'s test is

a demanding one, so much so that this Court has yet to an-nounce a new rule of criminal procedure capable of meeting it." *Ramos*, 590 U. S., at ___ (opinion of GORSUCH, J.) (slip op., at 24); see also *id.,* at ___–___ (KAVANAUGH, J., concur-ring in part) (slip op., at 16–17). The lead opinion added that *Teague* is "demanding by design, expressly calibrated to address the reliance interests States have in the finality of their criminal judgments." *Id.,* at ___ (opinion of GORSUCH, J.) (slip op., at 24). In light of that explicit lan-guage in *Ramos*, the Court's decision today can hardly come as a surprise.

In short, the Court's holding today—namely, that *Ramos* does not apply retroactively on federal collateral review—carefully adheres to *Ramos* and tracks the Court's many longstanding precedents on retroactivity.

*Second*, the dissent suggests that the Court knows that *Ramos* should apply retroactively under the watershed ex-ception, but wants to avoid applying *Ramos* retroactively, and for that reason has decided to just eliminate the water-shed exception altogether. That suggestion is unfounded. *Ramos* was a momentous decision, and those of us who joined it continue to agree with it. But as we have ex-plained, *Ramos* itself analyzed the Court's retroactivity precedents and foretold today's decision on retroactivity. We are simply following through on what *Ramos* (as well as the Court's many other precedents) already said about ret-roactivity to now squarely hold that *Ramos* does not apply retroactively on federal collateral review. If we thought otherwise and believed that *Ramos* qualified under the Court's precedents as a rule that applies retroactively, we would certainly say so. But applying our retroactivity prec-edents, we have concluded that *Ramos* does not apply ret-roactively—just as the Court has previously held that other historic cases like *Mapp*, *Miranda*, *Duncan*, *Batson*, and *Crawford* did not apply retroactively. After reaching that

conclusion, we then took account of the overall jurispruden-
tial landscape of the last several decades in *Teague* cases
and acknowledged what has become unmistakably clear:
The purported watershed exception is moribund.

*Third*, on that last point, the dissent responds that
*Teague* nominally identified a retroactivity exception for
watershed procedural rules and that we should do so as
well. But the problem, as we see it, is that *Teague* simulta-
neously said that it was "unlikely" that new procedural
rules would qualify as watershed. 489 U. S., at 313 (plural-
ity opinion). So *Teague* took with one hand what it seem-
ingly gave with the other. And in the 32 years since *Teague*,
this Court has never once held that a new procedural rule
qualifies for the purported watershed exception. What is
more, the Court has regularly repeated that *Teague*'s wa-
tershed exception would likely never be satisfied. The
Court today need not and does not overrule any post-*Teague*
cases that held the watershed exception satisfied because
there are no post-*Teague* cases that held the watershed ex-
ception satisfied.

As noted above, no *stare decisis* values would be served
by continuing to indulge the fiction that *Teague*'s purported
watershed exception endures. No one can reasonably rely
on a supposed exception that has never operated in prac-
tice. And perpetuating what has become an illusory excep-
tion misleads litigants and judges, and needlessly expends
the scarce resources of defense counsel, prosecutors, and
courts. At this point, given that landmark cases like *Mapp*,
*Miranda*, *Duncan*, *Batson*, *Crawford*, and now *Ramos* have
not applied retroactively, we are simply acknowledging re-
ality and stating the obvious: The purported watershed ex-
ception retains no vitality.

*Fourth*, the dissent asserts that the Court is not living up
to the promise of *Ramos* for criminal defendants. To begin
with, the dissent cannot reasonably charge the Court with
failing to live up to *Ramos* given that *Ramos* itself explicitly

forecast today's decision on retroactivity. Moreover, with respect, JUSTICE KAGAN dissented in *Ramos*. To be sure, the dissent's position on the jury-unanimity rule in *Ramos* was perfectly legitimate, as is the dissent's position on retroactivity in today's case. And it is of course fair for a dissent to vigorously critique the Court's analysis. But it is another thing altogether to dissent in *Ramos* and then to turn around and impugn today's majority for supposedly shortchanging criminal defendants. To properly assess the implications for criminal defendants, one should assess the implications of *Ramos* and today's ruling *together*. And criminal defendants as a group are better off under *Ramos* and today's decision, taken together, than they would have been if JUSTICE KAGAN's dissenting view had prevailed in *Ramos*. If the dissent's view had prevailed in *Ramos*, no defendant would ever be entitled to the jury-unanimity right—not on collateral review, not on direct review, and not in the future. By contrast, under the Court's holdings in *Ramos* and this case, criminal defendants whose cases are still on direct review or whose cases arise in the future will have the benefit of the jury-unanimity right announced in *Ramos*. The rhetoric in today's dissent is misdirected. Different Members of the Court have reached different conclusions in *Ramos* and in this case, but each Member of the Court has acted in good faith in deciding the difficult questions before us.

*     *     *

To summarize the Court's retroactivity principles: New substantive rules alter "the range of conduct or the class of persons that the law punishes." *Summerlin*, 542 U. S., at 353. Those new substantive rules apply to cases pending in trial courts and on direct review, and they also apply retroactively on federal collateral review. New procedural rules alter "only the manner of determining the defendant's culpability." *Ibid.* (emphasis deleted). Those new procedural

rules apply to cases pending in trial courts and on direct review.  But new procedural rules do not apply retroactively on federal collateral review.

*Ramos* announced a new rule of criminal procedure.  It does not apply retroactively on federal collateral review. We affirm the judgment of the U. S. Court of Appeals for the Fifth Circuit.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 19–5807

———————

## THEDRICK EDWARDS, PETITIONER *v.* DARREL VANNOY, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[May 17, 2021]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

I join the majority in full because it correctly charts its way through precedent to hold expressly what we have long implied: "New procedural rules do not apply retroactively on federal collateral review." *Ante,* at 15. I write separately to highlight that we could also have resolved this case by applying the statutory text of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA directs federal courts to deny "any claim that was adjudicated on the merits in State court" unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U. S. C. §2254(d)(1). In 2011, petitioner urged a Louisiana court to hold that the Federal Constitution requires jury unanimity, and the court rejected that claim on the merits. That conclusion was consistent with *Apodaca* v. *Oregon*, 406 U. S. 404 (1972), in which this Court determined that the Constitution does not require unanimous jury verdicts for state criminal convictions. AEDPA thus leaves no room for this Court—or any federal court—to grant relief.

# I

## A

Congress first prescribed federal habeas jurisdiction in the Judiciary Act of 1789. That statute did not clearly define the scope of relief, but "the black-letter principle of the common law [was] that the writ was simply not available at all to one convicted of crime by a court of competent jurisdiction."[1] Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 465–466 (1963) (Bator); see *Felker* v. *Turpin*, 518 U. S. 651, 663 (1996) (citing *Ex parte Watkins*, 3 Pet. 193 (1830)). And the writ did not extend at all to prisoners confined under state authority. Bator 465.

Congress expanded the writ in the Habeas Corpus Act of 1867. Ch. 28, 14 Stat. 385. This Act extended the writ to prisoners in state custody but again provided only "bare guidelines" about the scope of the writ.[2] *Wright* v. *West*, 505 U. S. 277, 285 (1992) (plurality opinion). At first, this Court continued to apply the common-law rule that allowed a state petitioner to challenge only "the jurisdiction of the court that had rendered the judgment under which he was in custody." *Ibid.* But the Court later "expand[ed] the cat-

---

[1] Section 14 of the Judiciary Act provided that "courts of the United States . . . shall have power to issue writs of . . . *habeas corpus*" and that "justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of *habeas corpus* for the purpose of an inquiry into the cause of commitment.—*Provided*, That writs of *habeas corpus* shall in no cases extend to prisoners in gaol, unless where they are in custody, under or by colour of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." 1 Stat. 81–82.

[2] The relevant language of the Act stated that courts, "in addition to the authority already conferred by [the Judiciary Act of 1789], shall have power to grant writs of habeas corpus in all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." 14 Stat. 385.

egory of claims deemed to be jurisdictional for habeas purposes." *Ibid.* In 1874, for example, this Court found jurisdictional defects whenever state courts imposed sentences under unconstitutional statutes or imposed sentences not authorized by a statute. *Ibid.* (collecting cases). And a few decades later, the Court expanded relief to situations where, in the eyes of the federal court, "no state court had provided a full and fair opportunity to litigate" a prisoner's federal claims. *Ibid.* But absent a "jurisdictional" defect, a state court judgment was entitled to "'*absolute* respect'" as long as the prisoner "'had been given an adequate opportunity to obtain full and fair consideration of his federal claim in the state courts.'" *Ibid.* That rule left no room to grant relief simply because a state court made an error of law.

In 1953, this Court abruptly changed course and decided that federal courts could grant a writ of habeas corpus simply because they disagreed with a state court's judgment. See *Brown* v. *Allen*, 344 U. S. 443, 463. Around the same time, this Court declared that many constitutional rights of criminal procedure—some old, and some new—applied against the States. See, *e.g., Mapp* v. *Ohio*, 367 U. S. 643 (1961) (exclusionary rule); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (right to a court-appointed attorney); *Miranda* v. *Arizona*, 384 U. S. 436 (1966) (right to be informed of right against self-incrimination). That combination predictably raised tough questions: Should new rules apply retroactively to final state-court judgments, allowing federal courts to grant habeas relief even if state courts did not err when issuing their decisions? And if so, by what authority could federal courts grant that relief?

Admitting that "the Constitution neither prohibits nor requires retrospective effect," *Linkletter* v. *Walker*, 381 U. S. 618, 629 (1965), the Court took an atextual and ad hoc approach, presumably based on its interpretation of the 1867 Act. The Court declared that some federal decisions apply

retroactively to final state convictions, thus allowing federal courts to grant habeas relief depending on the "merits and demerits in each case." *Ibid.* To guide the analysis, *Linkletter* announced several factors for federal courts to consider: "the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Ibid.*

This rule did "not le[ad] to consistent results," so two decades later the Court tried a new interpretation of the 1867 Act. See *Teague* v. *Lane*, 489 U. S. 288, 302 (1989) (plurality opinion); *Danforth* v. *Minnesota*, 552 U. S. 264, 278 (2008) ("*Teague*'s general rule of nonretroactivity was an exercise of this Court's power to interpret the federal habeas statute"). Relevant here, *Teague* allowed federal courts to give new constitutional rules of criminal procedure retroactive effect on habeas review only if the new rule was "watershed," "'bedrock,'" or "'essential.'" 489 U. S*.,* at 311 (emphasis deleted).[3]

B

*Teague*, however, was not the final word on how federal courts should review the decisions of state courts. In 1996, Congress enacted AEDPA, the most significant change to the habeas corpus statute since 1867. AEDPA filled in the "bare guidelines" of the 1867 Act by creating a comprehensive system for addressing federal habeas claims brought by state prisoners. See *Wright*, 505 U. S., at 285.

Directly relevant here are two provisions that ensure that

───────────────

[3] Two years before *Teague*, this Court overruled cases that had allowed courts to apply the balancing test in *Linkletter* v. *Walker*, 381 U. S. 618 (1965), to cases on direct review, holding instead that the Constitution required courts to apply new procedural rules retroactively to cases on direct appellate review. *Griffith* v. *Kentucky*, 479 U. S. 314, 328 (1987). *Teague* also explained that new rules that "accord constitutional protection to . . . primary activity" retroactively apply to cases on federal collateral review. 489 U. S., at 307, 310–311. These are considered substantive rules. See *Welch* v. *United States*, 578 U. S. 120, 128 (2016).

state courts have the primary role in adjudicating these claims. First, a prisoner must exhaust his claims in state court before he can seek relief in federal court. If "any available [state-law] procedure" remains open, a federal "writ of habeas corpus . . . shall not be granted." §§2254(b)–(c). Second, once a state court has had the opportunity to decide that claim, AEDPA demands that federal courts respect that judgment. The law precludes relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." §2254(d). It is not enough for a federal court to disagree with the state court—much less disagree on a point of law that this Court had not yet settled when the state court issued its judgment. Rather, the state court's decision must conflict with clearly established law and be obviously wrong "beyond any possibility for fairminded disagreement." *Harrington* v. *Richter*, 562 U. S. 86, 103 (2011); *Greene* v. *Fisher*, 565 U. S. 34, 38–40 (2011).

## II
## A

Here, the system worked as designed. Edwards presented his unanimous jury claim to a Louisiana court. And the state court reasonably relied on *Apodaca* in rejecting that claim. AEDPA is clear about what happens next—relief "shall not be granted." §2254(d).

Our analysis could have begun and ended there—with §2254(d)(1)'s plain text. Congress, through AEDPA, has made clear that federal courts cannot provide relief in this case. See *Montgomery* v. *Louisiana*, 577 U. S. 190, 221

(2016) (Scalia, J., dissenting); see also *Ex parte Bollman*, 4
Cranch 75, 94 (1807) (Marshall, C. J.) ("[T]he power to
award the writ by any of the courts of the United States,
must be given by written law").

## B

The Court, instead, relies on *Teague*. I join the Court's
opinion because it correctly applies precedent and leads to
the same judgment, but I would be remiss if I did not point
out two other problems with *Teague*.

First, it has *never* been clear what gave this Court au-
thority to grant habeas relief to state prisoners based on
"new" constitutional rules of criminal procedure. *Teague*
did not explain why the 1867 Act gave federal courts this
power. Moreover, *Teague* primarily focused on moving the
law in the opposite direction of *Linkletter*'s permissive ap-
proach to collaterally reviewing final state convictions. See
*Danforth*, 552 U. S., at 278 ("*Teague* . . . situated the rule it
announced in th[e] line of cases adjusting the scope of fed-
eral habeas relief in accordance with equitable and pruden-
tial considerations"). Even if federal courts had this power,
we never decided whether Congress' most recent version of
the habeas statute—AEDPA—continued to allow such re-
lief. Given all that, the majority wisely closes a door to ret-
roactive relief that likely never existed in the first place.

Second, the Court's reliance on *Teague* today and in the
past should not be construed to signal that AEDPA is an
afterthought in analyzing a claim like petitioner's or that
*Teague* could justify relief where AEDPA forecloses it.
AEDPA does contemplate that some new constitutional
rules might be retroactive in narrow circumstances. See
§§2254(e)(2)(A)(i) (evidentiary hearings), 2244(b)(2)(A) (sec-
ond-or-successive bar), 2244(d)(1)(C) (statute of limita-
tions). But it does not contemplate retroactive rules upset-
ting a state court's adjudication of an issue that reasonably
applied the law at the time. Section 2254(d)—the absolute

bar on claims that state courts reasonably denied—has no exception for retroactive rights.  Congress' decision to create retroactivity exceptions to the statute of limitations and to the bar on second-or-successive petitions but not for §2254(d) is strong evidence that *Teague* could never have led to relief here.  *Russello* v. *United States*, 464 U. S. 16, 23 (1983).[4]  The plain text applies regardless of what a previous interpretation of a previous statute says.[5]

\*          \*          \*

A state court rejected petitioner's claim that he was entitled to a unanimous jury verdict.  That adjudication was not unreasonable or contrary to clearly established federal law.  AEDPA's explicit directive thus independently resolves this case: "a writ of habeas corpus . . . shall not be granted." §2254(d).

———————

[4] As JUSTICE GORSUCH correctly points out, federal courts have "equitable discretion to decide whether to issue the writ or to provide a remedy," which includes the powers to create doctrines such as harmless error.  *Post*, at 8 (concurring opinion).  And federal courts can rely on those doctrines as well as statutory bars to deny relief.  That is why, as JUSTICE GORSUCH explains, an equitable retroactivity bar with no watershed exception can independently justify denying relief.  *Post,* at 9, n. 5.

[5] The Constitution does not require that habeas relief be available for new "watershed" rules of criminal procedure.  See, *e.g.*, *Brown* v. *Allen*, 344 U. S. 443, 532–533 (1953) (Jackson, J., concurring in result); *Linkletter*, 381 U. S., at 629.  *Teague* also acknowledged that a later change in law does not require invalidating a final judgment.  See 489 U. S., at 308–309 (plurality opinion).  And again, habeas corpus traditionally did not apply at all to prisoners sentenced by a court with valid jurisdiction.  See Bator 465–466.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–5807

_____

## THEDRICK EDWARDS, PETITIONER *v.*
## DARREL VANNOY, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[May 17, 2021]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring.

Sometimes this Court leaves a door ajar and holds out the possibility that someone, someday might walk through it—though no one ever has or, in truth, ever will. In *Teague* v. *Lane*, 489 U. S. 288 (1989), the Court suggested that one day it might apply a new "watershed" rule of criminal procedure retroactively to undo a final state court conviction. But that day never came to pass. Instead, over the following three decades this Court denied "watershed" status to one rule after another. Rules guaranteeing individuals the right to confront their accusers. Rules ensuring that only a jury may decide a defendant's fate in a death penalty case. Rules preventing racially motivated jury selection. All failed to win retroactive application. Today, the Court candidly admits what has been long apparent: *Teague* held out a "false hope" and the time has come to close its door. *Ante*, at 15. We take this step not because this Court's criminal procedure rulings are somehow unimportant. Any decision seeking to enforce liberties enshrined in the Constitution has a claim to "watershed" importance. Instead, we abandon *Teague*'s test because it poses a question this Court has no business asking.

## I

Though we often refer to *the* writ of habeas corpus, the common law knew several. See *Ex parte Bollman*, 8 U. S. (4 Cranch) 75, 97–98 (1807). All had one thing in common: Each required a custodian to produce (*habeas*) a prisoner's person (*corpus*). But they served different ends. Some writs were tools for moving a prisoner from one court to another—whether for a new prosecution (*ad respondendum*) or to execute a prior judgment (*ad satisfaciendum*). Others functioned more like a subpoena to procure a prisoner's presence to testify in court (*ad testificandum*). Others still served to remove a case from an inferior court to a superior one (*cum causa*). 3 W. Blackstone, Commentaries on the Laws of England 129–131 (1768).

Among them all, however, only one came to be known as "The Great Writ." The writ of *habeas corpus ad subjiciendum* was a mechanism for asking "*why* the liberty of [a] subject[] is restrained." *Id.*, at 131 (emphasis added). Leading up to the English Civil War, monarchs sometimes jailed their subjects summarily and indefinitely, with little explanation and even less process. *E.g.*, *Darnel's Case*, 3 How. St. Tr. 1–59 (K. B. 1627). In response, common law courts developed the *ad subjiciendum* writ to force the Crown to provide reasons for its actions and, if necessary, to ensure adequate process—like a criminal trial—to justify any further detention. See Petition of Right, 3 Car. 1, ch. 1, ¶¶ 5, 8 (1628). In other words, "habeas corpus [w]as the instrument by which due process could be insisted upon." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 555 (2004) (Scalia, J., dissenting).

Great though it was, the writ's power was never limitless. A prisoner confined under a final judgment of conviction by a court of competent jurisdiction stood on different footing than one confined by the King without trial. A court might issue the writ asking, "What is the reason for confinement?"

But if the return came back: "Because he's serving a custo-
dial sentence after being convicted of a crime," the inquiry
was usually at an end. See *Opinion on the Writ of Habeas
Corpus*, Wilm. 77, 88, 97 Eng. Rep. 29, 36 (K. B. 1758); cf.
*Anonymus*, Cart. 221, 124 Eng. Rep. 928 (C. P. 1671); Ha-
beas Corpus Act of 1679, 31 Car. 2, ch. 2, ¶¶ 2, 20. Custody
pursuant to a final judgment was *proof* that a defendant
had received the process due to him. See, *e.g.*, *Bushell's
Case*, Vaugh. 135, 142–143, 124 Eng. Rep. 1006, 1009–1010
(C. P. 1670).

   In 1789, Congress authorized federal courts to issue the
habeas writ. 1 Cong. ch. 20, § 14, 1 Stat. 73, 81–82; *Ex parte
Bollman*, 8 U. S. (4 Cranch), at 93–94. When called upon to
interpret that statute, this Court defined the scope of ha-
beas review by looking "to the common law." *Id.*, at 93–94.
Unsurprisingly, it proceeded to restate the longstanding
rule associated with criminal judgments: *Ad subjiciendum*
provided no recourse for a prisoner confined pursuant to a
final judgment of conviction. *Ex parte Watkins*, 28 U. S. (3
Pet.) 193, 209 (1830). As Chief Justice Marshall rhetori-
cally asked, "is not that judgment in *itself* sufficient cause?"
*Id.*, at 202 (emphasis added).

   If the answer was nearly always yes, one important ex-
ception existed both here and in England. A habeas court
could grant relief if the court of conviction lacked jurisdic-
tion over the defendant or his offense. *Id.*, at 202–203. Still,
the exception was "confined" to that "limited class of cases."
*Ex parte Parks*, 93 U. S. (3 Otto) 18, 21 (1876). One judge
could not grant relief just because he might have decided
the merits of the case differently than another had. As this
Court put it, a perceived "error in the judgment or proceed-
ings, under and by virtue of which the party is imprisoned,
constitute[d] no ground for" relief. *Ex parte Siebold*, 100
U. S. (10 Otto) 371, 375 (1880). Any other approach, the
Court explained, risked converting the habeas writ into "a
mere writ of error," little more than a chance to redo a trial

or its appeal.  *Ibid.*

Originally, Congress allowed federal courts to issue ha-
beas writs only to federal custodians.  Reconstruction
changed that.  After the Civil War, Congress granted fed-
eral courts the power to issue habeas writs to state authori-
ties as well.  See Act of Feb. 5, 1867, 39 Cong. ch. 28, § 1,
14 Stat. 385, 385.[1]  Even then, however, this Court contin-
ued to interpret the habeas statute consistent with histori-
cal practice.  If a prisoner was in custody pursuant to a final
state court judgment, a federal court was powerless to re-
visit those proceedings unless the state court had acted
without jurisdiction.  *E.g., In re Graham*, 138 U. S. 461, 462
(1891); *Tinsley* v. *Anderson*, 171 U. S. 101, 104–106 (1898);
*Markuson* v. *Boucher*, 175 U. S. 184, 185–186 (1899); *Med-
craf* v. *Hodge*, 245 U. S. 630, 630 (1917) (*per curiam*).

Under the view that prevailed in this country for most of
our history, and in England for even longer, *Teague*'s ques-
tion about the "retroactive" application of "watershed" rules
of criminal procedure to undo final criminal judgments
would have made no sense.  Because a final judgment of
conviction, pursuant to a full-fledged criminal trial, was the
process due to a criminal serving a custodial sentence, the
habeas writ had served its purpose.  A final judgment evi-
denced a lawful basis for confinement and was "binding on
all the world."  *Ex parte Watkins,* 28 U. S. (3 Pet.), at 207.

──────────

[1] That Act conferred on federal courts the "power to grant writs of ha-
beas corpus in *all* cases where any person may be restrained of his or her
liberty in violation of" federal law.  *Ibid.* (emphasis added).  Two earlier
statutes extended federal habeas jurisdiction to state custodians, but
only for a much narrower class of cases.  In 1833, Congress authorized
federal courts to issue habeas process to state custodians detaining fed-
eral officers for acts taken to implement federal law.  Act of Mar. 2, 1833,
22 Cong. ch. 57, § 7, 4 Stat. 632, 634–635.  This provision lives on in 28
U. S. C. § 2241(c)(2).  And in 1842, Congress permitted federal courts to
issue habeas process to state custodians detaining foreign officials whose
acts implicated the law of nations.  Act of Aug. 29, 1842, 27 Cong. ch.
257, 5 Stat. 539, 539.  It, too, lives on in 28 U. S. C. § 2241(c)(4).

## II

Only in the middle of the twentieth century did things really begin to change. In 1915, this Court suggested that a state court's extreme departure from "established modes" of criminal trial practice, such as proceeding under the specter of mob violence, might be akin to the loss of "jurisdiction," at least if no corrective mechanism like an appeal existed. *Frank* v. *Mangum*, 237 U. S. 309, 326, 335–336 (1915). But if that represented an innovation, it was a modest one.

The same cannot be said for *Brown* v. *Allen*, 344 U. S. 443, 464, 478 (1953). There, this Court effectively recast habeas as another way for federal courts to redress practically any error of federal law they might find in state court proceedings. Never mind that state courts are obligated to follow federal law under the Supremacy Clause. Never mind that those courts may have already passed on a defendant's argument about his federal rights. See *id.*, at 487; *id.*, at 497–501 (Frankfurter, J.). Never mind, too, that the defendant may have lost on appeal within the state court system, and even petitioned this Court for direct review. See *id.*, at 456–457; *id.*, at 489–497 (Frankfurter, J.). Everyone accepts that, in our criminal justice system today, a judgment becomes final only after the completion of a trial and the appellate process, including the opportunity to seek certiorari from this Court on questions of federal law. See *Clay* v. *United States*, 537 U. S. 522, 527 (2003).[2] Yet, even

---

[2] When a sovereign furnishes an opportunity to appeal (as state and federal governments now do), it necessarily invites an appellate court to revisit an initial merits determination. See J. Baker, An Introduction to English Legal History 148–153 (5th ed. 2019) (describing development of the appeal at common law); G. Jacob, A New Law-Dictionary (1729) (defining "appeal"). Under an appellate system, then, "[n]one of the[] [preceding decisions] are final" in an ultimate sense until any appeals are concluded. 3 W. Blackstone, Commentaries on the Laws of England 411 (1768).

after all that, *Brown* held, a federal district court could *still* vacate a final state court judgment based on any perceived error of federal law it might detect—and do so though the entire state judicial system and this Court had seen nothing amiss. 344 U. S., at 465–487; *id.,* at 506–507 (Frankfurter, J.).

The result? As Justice Jackson warned, habeas became little more than an ordinary appeal with an extraordinary Latin name. The Court "so departed from [the finality] principle that the profession now believes that the issues [federal courts] *actually consider* [in] habeas corpus are substantially the same as would be considered on appeal." *Id.*, at 540 (Jackson, J., concurring in result). "The fatal sentence that in real life writes *finis* to many causes"— *Judgment affirmed.* or *Certiorari denied.*—became "in legal theory . . . a complete blank." *Id.*, at 543. Justice Jackson feared that this result not only "trivializ[ed] . . . the writ," but promised practical problems too. *Id.*, at 536. A large new "haystack" of frivolous habeas petitions was sure to follow, making it that much harder for courts to identify the meritorious "needle." *Id.*, at 537. The only solution Justice Jackson could see was to hold fast to the traditional rule: A final judgment, after completion of trial and the exhaustion of any direct appellate review, was *res judicata*, and the sole exception was a lack of jurisdiction. *Id.*, at 543–544.

*Brown* not only upended centuries of settled precedent and invited practical problems; it produced anomalies as well. The very same term it decided *Brown*, this Court *rejected Brown*'s fix-any-error approach for final judgments issued by military courts. *Burns* v. *Wilson*, 346 U. S. 137, 142 (1953) (plurality opinion); *id.*, at 147 (Minton, J., concurring in judgment). So only state convicts—not United States service members—were afforded an additional avenue for appellate relief in the garb of habeas corpus proceedings. It turned out, too, that only state courts—not executive tribunals—were forced to suffer the indignity of

having their final judgments reopened. So federal courts wound up with more power to reopen the judgments of a different sovereign's courts than the administrative proceedings of the federal government itself. See *Rushing* v. *Wilkinson*, 272 F. 2d 633, 641 (CA5 1959); M. Howe, Foreword: The Supreme Court*,* 1952 Term, 67 Harv. L. Rev. 91, 160–162 (1953).

With time, these implications became clear and, as Justice Jackson predicted, *Brown*'s innovation proved unsustainable. The haystack just grew too large. During the 1960s, this Court incorporated the exclusionary rule against the States. *Mapp* v. *Ohio*, 367 U. S. 643, 655 (1961). It announced a Sixth Amendment right to a public defender. *Gideon* v. *Wainwright*, 372 U. S. 335, 339–340, 342 (1963). It barred the government from speaking to the defendant outside defense counsel's presence. *Massiah* v. *United States*, 377 U. S. 201, 204–206 (1964). And it announced a new script governing police interrogations. *Miranda* v. *Arizona*, 384 U. S. 436, 467–477 (1966). This proliferation of new federal procedural rights, combined with a federal post-conviction mechanism that functioned like an ordinary appeal, soon yielded a giant haystack of habeas petitions.

For years, this Court struggled to devise rules for sorting the hay from the needles. Its approach varied wildly and inconsistently over time. In a few cases, the Court held a new rule of criminal procedure should not apply retroactively to settled convictions. *Tehan* v. *United States ex. rel. Shott*, 382 U. S. 406, 409, n. 3, 419 (1966); *Linkletter* v. *Walker*, 381 U. S. 618, 622, 639–640 (1965). On occasion, though, it extended the benefit of a new rule to litigants with final criminal judgments—sometimes only to the named petitioner in this Court, *Jackson* v. *Denno*, 378 U. S. 368, 377 (1964), other times to everyone laboring under a final judgment, *McNerlin* v. *Denno*, 378 U. S. 575, 575 (1964) (*per curiam*). Justice Harlan called these divergent

results "an extraordinary collection of rules." *Desist* v. *United States*, 394 U. S. 244, 256–257 (1969) (Harlan, J., dissenting). He even wondered whether they could "properly be considered the legitimate products of a court of law." *Id.*, at 259.

### III

It was only in this world that *Teague*'s question about the retroactive application of new "watershed" rules of criminal procedure could even begin to make sense. In an effort to bring some coherence to the area, the Court refocused its attention on the terms of the federal habeas statute. The statute provides that "writs of habeas corpus *may* be granted"—not that they *must* be granted. 28 U. S. C. § 2241(a) (emphasis added); see also *id.* § 2243. The law thus invests federal courts with equitable discretion to decide whether to issue the writ or to provide a remedy. *Withrow* v. *Williams*, 507 U. S. 680, 716 (1993) (Scalia, J., concurring in part and dissenting in part).[3]

Exercising this remedial discretion, the Court began to develop doctrines aimed at returning the Great Writ closer to its historic office. It decided that some claims are not cognizable on federal habeas review if state courts provide a mechanism for review. *Stone* v. *Powell*, 428 U. S. 465, 494–495 (1976). It established procedural default rules to prevent habeas petitioners from evading independent and adequate state law grounds for sustaining their convictions. *Wainwright* v. *Sykes*, 433 U. S. 72, 86–87 (1977). It crafted a heightened harmless error standard, calibrated to reflect the finality interests at stake in the post-conviction context. *Brecht* v. *Abrahamson*, 507 U. S. 619, 633–638 (1993). And

---

[3] That is how this Court reads nearly identical text in the Declaratory Judgment Act (DJA). Because the DJA says federal courts "'*may* declare the rights and other legal relations of any interested party,'" district courts "possess discretion" to award declaratory relief. *Wilton* v. *Seven Falls Co.*, 515 U. S. 277, 282, 286 (1995).

it applied abuse-of-the-writ rules to prevent an endless cycle of petition and re-petition by prisoners with nothing but time on their hands. *McCleskey* v. *Zant*, 499 U. S. 467, 489–493 (1991).

Chief among these new-but-old developments was *Teague*. Drawing on the historic role of habeas, the Court held that newly recognized rules of criminal procedure should not normally apply to cases "which have become final." 489 U. S., at 304–310.[4] Hard experience since *Brown* had reminded the Court that finality, "the idea that at *some* point a criminal conviction reaches an end, a conclusion, a termination, 'is *essential* to the operation of our criminal justice system.'" *Prost* v. *Anderson*, 636 F. 3d 578, 582 (CA10 2011). One might "always continue to ask" whether a particular judgment was "correct." P. Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 446–448 (1963). But if the rule of law means anything, it means the final result of proceedings in courts of competent jurisdiction *establishes* what is correct "in the eyes of the law." *Herrera* v. *Collins*, 506 U. S. 390, 399–400 (1993).[5]

—————

[4] Although the lead opinion in *Teague* garnered only a plurality, a majority of the Court adopted the plurality's rule later that same year in *Penry* v. *Lynaugh*, 492 U. S. 302, 313 (1989).

[5] Apparently believing our judge-made doctrines did not go far enough, Congress added further "new restrictions" of its own in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Felker* v. *Turpin*, 518 U. S. 651, 664 (1996). But AEDPA creates only additional conditions to relief; it did not do away with the discretion afforded courts in the habeas statute, or the various rules this Court has formulated in the exercise of that discretion. As this Court has (unanimously) explained, "AEDPA did not codify *Teague*" and the one "neither abrogates [n]or qualifies the other." *Greene* v. *Fisher*, 565 U. S. 34, 39 (2011). That is why *Teague*'s retroactivity bar operates "in addition" to AEDPA's relitigation bar in 28 U. S. C. § 2254(d). *Horn* v. *Banks*, 536 U. S. 266, 272 (2002) (*per curiam*). Because a retroactivity bar and a relitigation bar both pose threshold barriers, JUSTICE THOMAS's concurrence highlights how AEDPA provides

IV

While *Teague* did much to return the writ to its original station, it didn't quite complete the journey. After insisting that final judgments cannot be reopened as a "general rule," *Teague* left some wiggle room. It added that some new rules of criminal procedure might yet apply retroactively if they had "watershed" significance. 489 U. S., at 311. Why? Because "'time and growth in social capacity, as well as judicial perceptions,'" might "'alter our understanding of the *bedrock procedural elements*'" necessary to satisfy notions of "'fairness.'" *Ibid.* To help the world know what a watershed rule might look like, the Court described it in various ways—"bedrock," "fundamental," "central," an "absolute prerequisite." *Id.*, at 311–314. A rule fitting that bill, *Teague* said, would do two things: (1) "'significantly improve'" existing procedures for determining factual guilt or innocence and (2) "implicate the fundamental fairness of the trial." *Id.*, at 312–313.[6]

But all these words have yielded nothing. In more than three decades since *Teague*, not a single new rule of criminal procedure has satisfied its "watershed" test. *Ante*, at 10–15. Nor is it as if we have lacked promising candidates.

—————

an *additional* reason why the Fifth Circuit correctly denied a certificate of appealability here. *Ante,* at 5 (concurring opinion); see *Miller-El* v. *Cockrell*, 537 U. S. 322, 350 (2003) (Scalia, J., concurring).

[6] *Teague* also discussed an exception to the finality rule for certain "substantive rules." Because the parties agree that *Ramos* involved only a new rule of criminal procedure, little need be said about *Teague*'s "substantive rule" exception. But it is worth noting that substantive rules, which place certain conduct "'beyond the power of the criminal law-making authority to prescribe,'" *id.*, at 307, bear at least some resemblance to this Court's early cases finding a lack of jurisdiction over a defendant or an offense. See *Ex parte Siebold*, 100 U. S. (10 Otto), at 376; *Ex parte Parks*, 93 U. S. (3 Otto), at 20–21. Perhaps this aspect of *Teague* can be understood as accurately invoking the jurisdictional exception to the finality rule; perhaps not. See *Brown*, 344 U. S., at 533, n. 4 (Jackson, J., concurring in result). But that question is for another day.

This Court has refused "watershed" status to new rules that seek to ensure death penalty decisions are made by jurors rather than judges. See *Schriro* v. *Summerlin*, 542 U. S. 348 (2004) (denying watershed status to *Ring* v. *Arizona*, 536 U. S. 584 (2002)). New rules designed to ensure race discrimination plays no role in jury selection met the same fate even before *Teague*. See *Allen* v. *Hardy*, 478 U. S. 255 (1986) (*per curiam*) (denying retroactive application to *Batson* v. *Kentucky*, 476 U. S. 79 (1986)). Rules that sought to realign our jurisprudence with the original meaning of the Sixth Amendment's Confrontation Clause have failed to qualify too. See *Whorton* v. *Bockting*, 549 U. S. 406 (2007) (denying watershed status to *Crawford* v. *Washington*, 541 U. S. 36 (2004)).

The Court's decision today retraces this familiar path. It denies "watershed" status to *Ramos* v. *Louisiana*, 590 U. S. \_\_\_ (2020), a decision that (like *Crawford*) returned us to the original meaning of the Sixth Amendment—and one that (like *Ring* and *Batson*) concerns a vital aspect of the jury trial right. The Court explains why this result necessarily follows from our post-*Teague* precedents: If so many other highly consequential rulings have failed to clear *Teague*'s bar, it's hard to see how *Ramos* might. One could even say that any other result would defy this Court's recent precedents. *Ante*, at 14.

At the same time, though, one might *also* say these precedents illustrate how mystifying the whole *Teague* project has been from its inception. If *Teague* only prohibits the retroactive application of *new* rules of criminal procedure, after all, it's not exactly obvious why that prohibition applies to cases like *Crawford* or *Ramos*. Both decisions sought to realign this Court's decisions with the original meaning of the Sixth Amendment; in that sense, the rights they recognized were anything but new. And to the extent *Teague* asks whether a new rule is "fundamental" or "bedrock," it's hard to see how rights originally memorialized in

the Constitution could fail to qualify. Certainly, this Court
is in no position to second-guess the judgment of those who
wrote and ratified the Constitution. Surely, too, many of
the other rules of criminal procedure this Court has found
less than "fundamental" since *Teague* seem anything but
that to those whose lives they affect. Nor is it only *Teague*'s
results that mystify. The test itself has been fraught with
contradictions from the start. It asks litigants to be on the
lookout for new procedural protections "'implicit in the con-
cept of ordered liberty.'" *Beard* v. *Banks*, 542 U. S. 406, 417
(2004). At the same time, we have been told, the fact that
"a new procedural rule is 'fundamental' in some abstract
sense is not enough." *Summerlin*, 542 U. S., at 352.

For me, it's here where the history canvassed above mat-
ters. This Court's (in)activity since *Teague* only begins to
make sense when viewed against the backdrop of the tradi-
tional rule that old judgments are impervious to new chal-
lenges. Yes, this Court's decisions should apply to all cases
pending in trial courts and on direct appeal. But they
should not apply retroactively in habeas. The reason has
nothing to do with whether Members of this Court happen
to think the rules they announce are "new" in some sense
or insufficiently "fundamental" in another. It's simpler
than that: The writ of habeas corpus does not authorize
federal courts to reopen a judgment issued by a court of
competent jurisdiction once it has become final. *Supra*,
at 2–4.

It's here, too, where today's decision makes its real con-
tribution. If *Teague* pointed us back in the direction of the
traditional rule, each of the cases that has followed in its
wake has edged us, step-by-step, closer still. Today's deci-
sion advances the progress by making express what has
long been barely implicit: The "watershed" exception for
new rules of criminal procedure is no exception at all. *Ante*,
at 15. Not only does this development do much to honor the
traditional understanding of habeas review and the great

weight of this Court's precedents throughout its history. It also allows us to retire a test that was unknown in law until 1989 and whose contours remain unknowable decades later. It frees this Court from the dreary task of needing to concoct reasons to denigrate the importance of obviously important rules like those discussed in *Ramos*, *Ring*, *Batson*, and *Crawford*, which affect the lives and liberty of countless individuals. It does away with the strange business of having to repackage old rules as new ones. And it eliminates the need for litigants and lower courts to endure years of protracted litigation—tangling with a contradictory test and seemingly inexplicable precedents—all sure to achieve nothing. The Court's candor today is admirable— and correct.[7]

With these observations, I am pleased to join the Court's opinion. My vote in similar cases to come will, I hope, "be guided as nearly as [possible] by the principles set forth herein." *Brown*, 344 U. S., at 548 (Jackson, J., concurring in result).

———————

[7] The dissent criticizes today's decision as a departure from modern habeas precedent. *Post*, at 2; *post*, at 3, n. 2; *post*, at 12–13. But the dissent's history is selective. The dissent champions decisions from the 1950s, '60s, and '70s. But it disregards how those decisions departed from a century of this Court's precedents and the common law before that. *Supra*, at 5–8. At the same time, the dissent's account overlooks this Court's precedents refusing to afford retroactive application in every case since the 1980s. *Post*, at 10–11; *post*, at 12, n. 7. The dissent may prefer decisions within a particular 30-year window. But it is too much to say this preference is required to "[r]espect[] *stare decisis*." *Post*, at 1, n. 1.

# SUPREME COURT OF THE UNITED STATES

———————

No. 19–5807

———————

## THEDRICK EDWARDS, PETITIONER *v.* DARREL VANNOY, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[May 17, 2021]

JUSTICE KAGAN, with whom JUSTICE BREYER and
JUSTICE SOTOMAYOR join, dissenting.

"A verdict, taken from eleven, [i]s no verdict at all," this
Court proclaimed just last Term. *Ramos* v. *Louisiana*, 590
U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (slip op., at 4–5) (internal quota-
tion marks omitted).  Citing centuries of history, the Court
in *Ramos* termed the Sixth Amendment right to a unani-
mous jury "vital," "essential," "indispensable," and "funda-
mental" to the American legal system.  *Id.*, at \_\_\_, \_\_\_, \_\_\_
(slip op., at 4, 6, 7).  The Court therefore saw fit to disregard
*stare decisis* and overturn a 50-year-old precedent enabling
States to convict criminal defendants based on non-unani-
mous verdicts.[1]  And in taking that weighty step, the Court
also vindicated core principles of racial justice.  For in the
Court's view, the state laws countenancing non-unanimous
verdicts originated in white supremacism and continued in
our own time to have racially discriminatory effects.  See
*id.*, at \_\_\_–\_\_\_ (slip op., at 2–3); *id.*, at \_\_\_ (SOTOMAYOR, J.,
concurring in part) (slip op., at 4); *id.*, at \_\_\_–\_\_\_

———————

[1] I dissented in *Ramos* precisely because of its abandonment of *stare
decisis*.  See 590 U. S., at \_\_\_–\_\_\_ (slip op., at 5–9) (ALITO, J., dissenting);
see also *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 455 (2015)
("Respecting *stare decisis* means sticking to some wrong decisions").  Now
that *Ramos* is the law, *stare decisis* is on its side.  I take the decision on
its own terms, and give it all the consequence it deserves.

(KAVANAUGH, J., concurring in part) (slip op., at 12–15). Put all that together, and it is easy to see why the opinions in *Ramos* read as historic. Rarely does this Court make such a fundamental change in the rules thought necessary to ensure fair criminal process. If you were scanning a thesaurus for a single word to describe the decision, you would stop when you came to "watershed."

Yet the Court insists that *Ramos*'s holding does not count as a "watershed" procedural rule under *Teague* v. *Lane*, 489 U. S. 288, 311 (1989) (plurality opinion). The result of today's ruling is easily stated. *Ramos* will not apply retroactively, meaning that a prisoner whose appeals ran out before the decision can receive no aid from the change in law it made. So Thedrick Edwards, unlike Evangelisto Ramos, will serve the rest of his life in prison based on a 10-to-2 jury verdict. Only the reasoning of today's holding resists explanation. The majority cannot (and indeed does not) deny, given all *Ramos* said, that the jury unanimity requirement fits to a tee *Teague*'s description of a watershed procedural rule. Nor can the majority explain its result by relying on precedent. Although flaunting decisions since *Teague* that held rules non-retroactive, the majority comes up with none comparable to this case. Search high and low the settled law of retroactivity, and the majority still has no reason to deny *Ramos* watershed status.

So everything rests on the majority's last move—the overturning of *Teague*'s watershed exception. If there can never be *any* watershed rules—as the majority here asserts out of the blue—then, yes, jury unanimity cannot be one. The result follows trippingly from the premise. But adopting the premise requires departing from judicial practice and principle. In overruling a critical aspect of *Teague*, the majority follows none of the usual rules of *stare decisis*. It discards precedent without a party requesting that action. And it does so with barely a reason given, much less the "special justification" our law demands. *Halliburton Co.* v. *Erica P.*

*John Fund, Inc.*, 573 U. S. 258, 266 (2014). The majority in that way compounds its initial error: Not content to misapply *Teague*'s watershed provision here, see *ante*, at 10–14, the majority forecloses any future application, see *ante*, at 14–15. It prevents any procedural rule ever—no matter how integral to adjudicative fairness—from benefiting a defendant on habeas review. Thus does a settled principle of retroactivity law die, in an effort to support an insupportable ruling.

I

Start with what *Teague* and its progeny repeatedly said about what makes a new rule of criminal procedure "watershed" (so that, before today, the rule applied retroactively).[2] A watershed rule, we held, is "implicit in the concept of ordered liberty." *Teague*, 489 U. S., at 311 (plurality opinion) (internal quotation marks omitted). Such a rule addresses one of "the bedrock procedural elements" of the criminal process. *Ibid.* (emphasis deleted). Or similarly stated, it plays a "fundamental" and "central[ ]" role in a trial. *Beard* v. *Banks*, 542 U. S. 406, 418, 420 (2004). More specifically, a new rule, to qualify as watershed, must be "essential to [the trial's] fairness." *Whorton* v. *Bockting*, 549 U. S. 406, 418 (2007); see *Teague*, 489 U. S., at 312 (plurality opinion). And it must go to the defendant's guilt or innocence, "prevent[ing] an impermissibly large risk of an inaccurate conviction." *Whorton*, 549 U. S., at 418 (internal quotation marks omitted); see *Teague*, 489 U. S., at 312 (plurality opinion). Those requirements set a high bar. But they capture—or anyway, were once meant to—a "small core of

_____

[2] Prior to *Teague*, the Court gave retroactive effect to a somewhat wider range of new procedural rules. See *ante*, at 13, n. 5; *Danforth* v. *Minnesota*, 552 U. S. 264, 271–273 (2008). To find the no-retroactivity-ever rule that the majority announces today, a time traveler would have to go back to around 1950—when the Bill of Rights' protections for criminal defendants did not even apply to the States. See *ibid.*

rules" needed to fairly adjudicate a defendant's guilt. *Beard*, 542 U. S., at 417.

The first clue that the unanimity rule falls within *Teague*'s small core is that the Court thought its adoption justified overturning precedent. *Ramos* didn't just announce a new rule. It reversed a prior, well-settled one. As the majority recounts, "*Ramos* repudiated this Court's 1972 decision in *Apodaca* v. *Oregon*, 406 U. S. 404, which had allowed non-unanimous juries in state criminal trials." *Ante*, at 1. Such a toppling of precedent needs a special justification—more than a run-of-the-mill claim of error. To meet that demand, the *Ramos* majority described *Apodaca* as flouting the essential "meaning of the Sixth Amendment's jury trial right," as revealed in both historical practice and judicial decisions. 590 U. S., at ___ (slip op., at 21). Two concurring Justices added, to support discarding this "egregiously wrong" precedent, that the unanimity rule prevents improper verdicts: *Apodaca* "sanctions the conviction" of some defendants who would otherwise defeat the State's efforts "to [meet] its burden" of proving guilt. 590 U. S., at ___ (KAVANAUGH, J.) (slip op., at 12); *id.*, at ___ (SOTOMAYOR, J.) (slip op., at 2). And the majority and concurrences alike invoked racial justice to support abandoning *stare decisis*, explaining how a non-unanimity rule has posed a special danger of canceling Black jurors' votes. See *id.*, at ___–___, ___ (slip op., at 1–2, 21); *id.*, at ___ (SOTOMAYOR, J.) (slip op., at 4); *id.*, at ___–___ (KAVANAUGH, J.) (slip op., at 12–15); *infra*, at 8. At bottom, then, the Court took the unusual step of overruling precedent for the most fundamental of reasons: the need to ensure, in keeping with the Nation's oldest traditions, fair and dependable adjudications of a defendant's guilt. In this much alone, *Ramos*'s reasoning evokes this Court's descriptions of watershed rules.[3]

---

[3] The majority misunderstands my point about the interaction between

And putting talk of *stare decisis* aside, there remains much more in *Ramos* to echo *Teague*. If, as today's majority says, *Teague* is full of "adjectives," *ante*, at 10, so too is *Ramos*—and mostly the same ones. Jury unanimity, the Court pronounced, is an "essential element[ ]" of the jury trial right, and thus is "fundamental to the American scheme of justice." 590 U. S., at ___–___ (slip op., at 6–7). The Court discussed the rule's "ancient" history—"400 years of English and American cases requiring unanimity" leading up to the Sixth Amendment. *Id.*, at ___, ___ (slip op., at 15, 11). As early as the 14th century, English common law recognized jury unanimity as a "vital right." *Id.*, at ___ (slip op., at 4). Adopting that view, the early American States likewise treated unanimity as an "essential feature of the jury trial." *Id.*, at ___ (slip op., at 5). So by the time the Framers drafted the Sixth Amendment, "the right to a jury trial *meant* a trial in which the jury renders a unanimous verdict." *Id.*, at ___ (slip op., at 12) (emphasis in original). Because that was so, no jury verdict could stand (or in some metaphysical sense, even exist) absent full agreement: "A verdict, taken from eleven, was no verdict at all." *Id.*, at ___–___ (slip op., at 4–5) (internal quotation marks omitted). Unanimity served as a critical safeguard, needed to protect against wrongful deprivations of citizens' "hard-won liberty." *Id.*, at ___ (slip op., at 15). Or as Justice Story summarized the law a few decades after

―――――――

*stare decisis* and *Teague*. I am not saying that if a "right is important enough to justify overruling" precedent, then it is "important enough to apply retroactively." *Ante*, at 16. (If that were my claim, this dissent would be far shorter.) Rather, the overruling of precedent—and more, the justifications given to support that overruling—are elements to consider when deciding on a rule's watershed status. Or, as I say above, "a first clue." Here, that clue cuts against the majority: *Ramos* overturned precedent (rather than just announcing a new rule) on grounds strikingly reminiscent of *Teague*'s criteria for watershed status. Still more clues, pointing in the same direction, appear in the coming pages . . . .

the Founding: To obtain a conviction, "unanimity in the verdict of the jury is indispensable." *Id.*, at \_\_\_ (slip op., at 6).

If a rule so understood isn't a watershed one, then nothing is. (And that is, of course, what the majority eventually says.) Once more, from the quotations just above: "fundamental," "essential," "vital," "indispensable." No wonder today's majority declares a new-found aversion to "adjectives"—or, as a concurring opinion says, "all these words." *Ante*, at 10; *ante*, at 10 (GORSUCH, J., concurring). The unanimity rule, as *Ramos* described it, is as "bedrock" as bedrock comes. *Teague*, 489 U. S., at 315 (plurality opinion). It is as grounded in the Nation's constitutional traditions—with centuries-old practice becoming part of the Sixth Amendment's original meaning. And it is as central to the Nation's idea of a fair and reliable guilty verdict. When can the State punish a defendant for committing a crime? Return again to *Ramos*, this time going back to Blackstone: Only when "the truth of [an] accusation" is "confirmed by the unanimous suffrage" of a jury "of his equals and neighbours." 590 U. S., at \_\_\_ (slip op., at 4) (quoting 4 Commentaries on the Laws of England 343 (1769)). For only then is the jury's finding of guilt certain enough—secure enough, mistake-proof enough—to take away the person's freedom.

Twice before, this Court retroactively applied rules that are similarly integral to jury verdicts. First, in *Ivan V.* v. *City of New York*, 407 U. S. 203, 204 (1972) (*per curiam*), we gave "complete retroactive effect" to the rule of *In re Winship*, 397 U. S. 358 (1970), that a jury must find guilt "beyond a reasonable doubt." Like *Ramos*, *Winship* rested on an "ancient" legal tradition incorporated into the Constitution. 397 U. S., at 361. As in *Ramos*, that tradition served to "safeguard men" from "unjust convictions, with resulting forfeitures" of freedom. 397 U. S., at 362. And as in *Ramos*, that protection plays a "vital" part in "the American scheme of criminal procedure." 397 U. S., at 363–364. With all that established, the *Ivan V.* Court needed just two pages to hold

*Winship* retroactive, highlighting the reasonable-doubt standard's "indispensable" role in "reducing the risk" of wrongful convictions. 407 U. S., at 204–205. Second, in *Brown* v. *Louisiana*, 447 U. S. 323 (1980), we retroactively applied the rule of *Burch* v. *Louisiana*, 441 U. S. 130 (1979), that a six-person guilty verdict must be unanimous. Think about that for a moment: We held retroactive a unanimity requirement, no different from the one here save that it applied to a smaller jury. The reasoning should by now sound familiar. Allowing conviction by a non-unanimous jury "impair[s]" the "purpose and functioning of the jury," undermining the Sixth Amendment's very "essence." *Brown*, 447 U. S., at 331 (plurality opinion). It "raises serious doubts about the fairness of [a] trial." *Id.*, at 335, n. 13. And it fails to "assure the reliability of [a guilty] verdict." *Id.*, at 334. So when a jury has divided, as when it has failed to apply the reasonable-doubt standard, "there has been no jury verdict within the meaning of the Sixth Amendment." *Sullivan* v. *Louisiana*, 508 U. S. 275, 280 (1993).[4]

——————

[4] The majority argues that *Ivan V.* and *Brown* applied these new rules only to cases on direct appeal. See *ante*, at 13, n. 5. But that isn't right. Although *Ivan V.* itself involved a direct appeal, the Court has made clear that the "complete retroactive effect" *Ivan V.* gave *Winship* included cases in habeas. See, *e.g.*, *United States* v. *Johnson*, 457 U. S. 537, 562–563, n. 21 (1982). And similarly, lower courts uniformly understood *Brown* to govern habeas cases, even though a concurring opinion (which supplied the ruling's fifth and sixth votes) addressed only cases on direct appeal. See, *e.g.*, *Atkins* v. *Listi*, 625 F. 2d 525, 526 (CA5 1980); see also *Brown*, 447 U. S., at 337 (opinion of Powell, J., joined by Stevens, J.). Those applications to habeas cases make sense because the Court of that time did not often distinguish in its retroactivity rulings between direct and collateral review. See *Stovall* v. *Denno*, 388 U. S. 293, 300–301 (1967). For that reason, the majority must fall back on the argument that "*Brown* and *Ivan V.* were pre-*Teague* decisions" and "*Teague* tightened the previous standard" for retroactivity. *Ante*, at 13, n. 5. That is true enough, see *supra*, at 3, n. 2, but irrelevant here given *Brown* and *Ivan V*'s reasoning. As just noted, each of those decisions said everything a court would say today in designating a new rule "watershed"—in essence, that the rule is central to the process of fairly deciding on a

And something still more supports retroactivity here, for the opinions in *Ramos* (unlike in *Winship* or *Burch*) relied on a strong claim about racial injustice. The Court detailed the origins of Louisiana's and Oregon's non-unanimity rules, locating them (respectively) in a convention to "establish the supremacy of the white race" and "the rise of the Ku Klux Klan." 590 U. S., at ___ (slip op., at 2) (internal quotation marks omitted). Those rules, the Court explained, were meant "to dilute the influence [on juries] of racial, ethnic, and religious minorities"—and particularly, "to ensure that African-American juror service would be meaningless." *Ibid.* (internal quotation marks omitted). Two concurring opinions linked that history to current practice. "In light of the[ir] racist origins," JUSTICE KAVANAUGH stated, "it is no surprise that non-unanimous juries can make a difference"—that "[t]hen and now" they can "negate the votes of black jurors, especially in cases with black defendants." *Id.*, at ___ (slip op., at 13); see *id.*, at ___ (SOTOMAYOR, J.) (slip op., at 4). But that statement precludes today's result. If the old rule functioned "as an engine of discrimination against black defendants," *id.*, at ___ (KAVANAUGH, J.) (slip op., at 13), its replacement must "implicat[e]" (as watershed rules do) "the fundamental fairness and accuracy of the criminal proceeding," *Beard*, 542 U. S., at 417 (internal quotation marks omitted). Or as JUSTICE KAVANAUGH put the point more concretely, the unanimity rule then helps prevent "racial prejudice" from resulting in wrongful convictions. *Ramos*, 590 U. S., at ___ (slip op., at 15). The rule should therefore apply not just forward but back, to all convictions rendered absent its protection.

## II

The majority argues in reply that the jury unanimity rule

———————
defendant's guilt.

is not so fundamental because . . . . Well, no, scratch that. Actually, the majority doesn't contest anything I've said about the foundations and functions of the unanimity requirement. Nor could the majority reasonably do so. For everything I've said about the unanimity rule comes straight out of *Ramos*'s majority and concurring opinions. Just check the citations: I've added barely a word to what those opinions (often with soaring rhetoric) proclaim. Start with history. The ancient foundations of the unanimous jury rule? Check. The inclusion of that rule in the Sixth Amendment's original meaning? Check. Now go to function. The fundamental (or bedrock or central) role of the unanimous jury in the American system of criminal justice? Check. The way unanimity figures in ensuring fairness in criminal trials and protecting against wrongful guilty verdicts? Check. The link between those purposes and safeguarding the jury system from (past and present) racial prejudice? Check. In sum: As to every feature of the unanimity rule conceivably relevant to watershed status, *Ramos* has already given the answer—check, check, check— and today's majority can say nothing to the contrary.[5]

---

[5] The majority does try to say that the plurality opinion in *Ramos* nonetheless "plainly foreshadowed today's decision" by noting that *Teague*'s watershed test was "demanding by design," in recognition of the States' reliance interests. *Ante*, at 16–17 (internal quotation marks omitted); see also *ante*, at 17–19 (repeating the assertion twice more). But the *Ramos* plurality's description of the watershed test was nothing more than objective fact: Yes, the watershed test was purposefully demanding. As to whether the watershed test was *so* demanding as to exclude the jury unanimity rule, here is what the plurality had to say: "Whether the right to jury unanimity applies to cases on collateral review is a question for a future case where the parties will have a chance to brief the issue and we will benefit from their adversarial presentation." *Ramos*, 590 U. S., at \_\_\_ (slip op., at 24). Not a lot of "plain[] foreshadow[ing]" there. Only a fair bit of wisdom about how to resolve legal issues—which, as I'll later discuss, the majority could usefully have considered before overruling the watershed exception. See *infra*, at 13.

Instead, the majority relies on decisions holding non-retroactive various other—even though dissimilar—procedural rules. In making that argument from past practice, the majority adopts two discrete tactics. Call the first "throw everything against the wall." Call the second "slice and dice." Neither can avail to render the jury unanimity rule anything less than what *Ramos* thought it—as the majority concedes, "momentous." *Ante*, at 14.

As its first move, the majority lists as many decisions holding rules non-retroactive as it can muster. See *ante*, at 11–12 (reviewing a "long line of cases"). The premise here is that sheer volume matters: The majority presents the catalog as if every rule is as important as every other and as if comparing any to the unanimity requirement is beside the point. But that idea founders on this Court's constant refrain that watershed rules are only a small subset of procedural rules. See, *e.g.*, *Graham* v. *Collins*, 506 U. S. 461, 478 (1993). For under that view (as under the very meaning of "watershed"), nothing could be less surprising than that non-watershed rules greatly outnumber watershed ones. That inexorable fact cannot refute the designation of any given rule—much less of jury unanimity—as watershed. And the majority's kitchen-sink list becomes yet less probative of the issue here because most of its bulk comes from decisions on sentencing. See *ante*, at 11 (citing *Beard*, 542 U. S., at 408; *O'Dell* v. *Netherland*, 521 U. S. 151, 153 (1997); *Lambrix* v. *Singletary*, 520 U. S. 518, 540 (1997); *Sawyer* v. *Smith*, 497 U. S. 227, 229 (1990); *Schriro* v. *Summerlin*, 542 U. S. 348, 352 (2004)). But *Teague* itself explains why sentencing procedures are not watershed: A watershed rule, the Court said there, must go to the jury's "determination of innocence or guilt." 489 U. S., at 313 (plurality opinion); see *Beard*, 542 U. S., at 417. So the majority's indiscriminate inventory of non-retroactive rules cannot get it home.

Enter the majority's second stratagem, which tries to conquer by dividing. Here, the majority picks out "three aspects of *Ramos*" pointing toward watershed status, and names one prior decision to match each of the three. *Ante*, at 12. So in addressing the unanimity rule's "significance," the majority notes that the Court once held the jury-trial right non-retroactive. *Ante*, at 12–13 (citing *DeStefano* v. *Woods*, 392 U. S. 631, 633 (1968) (*per curiam*) and *Duncan* v. *Louisiana*, 391 U. S. 145 (1968)). In tackling *Ramos*'s return to "original meaning," the majority points to our decision that an originalist rule about hearsay evidence should not apply backward. *Ante*, at 13 (citing *Whorton*, 549 U. S., at 421 and *Crawford* v. *Washington*, 541 U. S. 36 (2004)). And in discussing *Ramos*'s role in "prevent[ing] racial discrimination," the majority invokes our denial of retroactivity to a rule making it easier to prove race-based peremptory strikes. *Ante*, at 13–14 (citing *Allen* v. *Hardy*, 478 U. S. 255, 261 (1986) (*per curiam*) and *Batson* v. *Kentucky*, 476 U. S. 79 (1986)).

What the majority doesn't find—or even pretend to—is any decision corresponding to *Ramos* on all of those dimensions. Take just a pair of examples. The Court has never suggested that requiring a bench trial has race-based purposes or effects. See *DeStefano*, 392 U. S., at 633–635.[6]

———————

[6] Even on the metric of significance alone, the Court has not previously ranked the jury-unanimity and jury-trial rights as today's majority does. As earlier noted, the Court in *Brown* found a unanimity rule retroactive despite its earlier holding that the jury-trial right was not. See *supra*, at 6–7. The Court explained that the accuracy and fairness concerns raised by divided juries—where, by definition, at least one person retains reasonable doubt—exceed those arising from judicial verdicts. See *Brown*, 447 U. S., at 334–335, n. 13 (plurality opinion). In insisting otherwise, the majority falls prey to a common greater-includes-the-lesser fallacy—akin to the view that if a State can eliminate a jury, it can impose jury rules of whatever kind it likes. See *ante*, at 12–13 (reasoning that the treatment of a "broader" right controls that of a "subsidiary" right); *Brown*, 447 U. S., at 334–335, n. 13 (rejecting precisely that view).

Similarly, the Court thought its new rule on hearsay evidence of less than towering import: Calling the rule "limited in scope," we doubted that it would have any effect on the "accuracy of factfinding." *Whorton*, 549 U. S., at 419. I'll resist making like points about other permutations because the main point here is a general one. The majority must slice and dice in this way—dividing *Ramos* into three for purposes of comparison—because it cannot find any rule analogous to jury unanimity on all relevant fronts. And that is for a simple reason: No procedure adopted since *Teague* so comprehensively fulfills that decision's criteria for retroactivity. If any rule is watershed, it is jury unanimity. See *supra*, at 6.

So the majority is left to overrule *Teague*'s holding on watershed rules.[7] On the last page or so of its merits discussion (before it turns to pre-butting this dissent), the majority eliminates the watershed exception, declaring it "long past time" to do so. *Ante*, at 15. *Teague* had said there would not be "many" (retroactive) watershed rules. 489 U. S., at 313 (plurality opinion). The majority now says there will be none at all. If that is so, of course, jury unanimity cannot be watershed. Finally, the majority offers an

––––––––––

[7] In describing the majority as overruling *Teague*, I do not mean it overrules only *Teague*. That decision doesn't stand alone in stating the watershed exception as governing law. As I count, the Court has recited the exception 17 more times before today. See *Montgomery* v. *Louisiana*, 577 U. S. 190, 198 (2016); *Welch* v. *United States*, 578 U. S. 120, 128 (2016); *Chaidez* v. *United States*, 568 U. S. 342, 347, n. 3 (2013); *Danforth*, 552 U. S., at 266, 274–275; *Whorton* v. *Bockting*, 549 U. S. 406, 416 (2007); *Beard* v. *Banks*, 542 U. S. 406, 416–417 (2004); *Horn* v. *Banks*, 536 U. S. 266, 271, n. 5 (2002) (*per curiam*); *Tyler* v. *Cain*, 533 U. S. 656, 665 (2001); *Bousley* v. *United States*, 523 U. S. 614, 619–620 (1998); *O'Dell* v. *Netherland*, 521 U. S. 151, 156–157 (1997); *Lambrix* v. *Singletary*, 520 U. S. 518, 539 (1997); *Gray* v. *Netherland*, 518 U. S. 152, 170 (1996); *Caspari* v. *Bohlen*, 510 U. S. 383, 396 (1994); *Graham* v. *Collins*, 506 U. S., 461, 477–478 (1993); *Gilmore* v. *Taylor*, 508 U. S. 333, 345 (1993); *Saffle* v. *Parks*, 494 U. S. 484, 494–495 (1990); *Sawyer* v. *Smith*, 497 U. S. 227, 241–242 (1990).

intelligible reason for declining to apply *Ramos* retroactively.

But in taking that road, the majority breaks a core judicial rule: respect for precedent. *Stare decisis* is a foundation stone of the rule of law, "promot[ing] the evenhanded, predictable, and consistent development of legal principles, foster[ing] reliance on judicial decisions, and contribut[ing] to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). Adherence to precedent is, of course, "not an inexorable command." *Id.*, at 828. *Ramos* itself teaches that much. But *Ramos* also shows how high *stare decisis* sets the bar for overruling a prior decision. To reverse course, we insist on compelling reasons, thorough explanation, and careful attention to competing interests. But not here. The majority crawls under, rather than leaps over, the *stare decisis* bar.

To begin with, no one here asked us to overrule *Teague*. This Court usually confines itself to the issues raised and briefed by the parties. See, *e.g.*, *United States* v. *Sineneng-Smith*, 590 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 3) (discussing "the principle of party presentation"). There may be reasons to ignore that rule in one or another everyday case. But to do so in pursuit of overturning precedent is nothing short of extraordinary. Cf. *Ramos*, 590 U. S., at \_\_\_, n. 4 (KAVANAUGH, J.) (slip op., at 9, n. 4) (An "important factor" protecting *stare decisis* "is that the Court typically does not overrule a precedent unless a party requests overruling"). We are supposed to (fairly) apply the prevailing law until a party asks us to change it. And when a party does make that request, we are supposed to attend to countervailing arguments—which no one here had a chance to make. That orderly process, skipped today, is what enables a court to arrive at a considered decision about whether to overthrow precedent.

Equally striking, the majority gives only the sketchiest of

reasons for reversing *Teague*'s watershed exception. In deciding whether to depart from precedent, the Court usually considers—and usually at length—a familiar set of factors capable of providing the needed special justification. See, *e.g.*, *Knick* v. *Township of Scott*, 588 U. S. ___, ___ (2019) (slip op., at 20) (listing such considerations). The majority can't be bothered with that customary, and disciplining, practice; it barely goes through the motions. Seldom has this Court so casually, so off-handedly, tossed aside precedent. In its page of analysis, the majority offers just one ground for its decision—that since *Teague*, the Court has not identified a new rule as watershed, and so "the purported exception has become an empty promise." *Ante*, at 15. But even viewed in the abstract, that argument does not fly. That the Court has not found a watershed rule since *Teague* does not mean it could or would not in the future. *Teague* itself understood that point: It saw value in the watershed exception even while recognizing that watershed rules would be few and far between. 489 U. S., at 313 (plurality opinion). And viewed in the context of this case, the majority's argument positively craters. For the majority today comes face-to-face with a rule that perfectly fits each of *Teague*'s criteria: Jury unanimity, as described in *Ramos*, is watershed—even though no prior rule was. See *supra*, at 4–8. That airtight match between *Ramos* and *Teague* refutes the majority's one stated reason for overruling the latter decision. The majority could not rely on the absence of watershed rules to topple *Teague* if it had just faithfully applied that decision to this case.

In choosing otherwise, the majority imposes a steep price for overruling *Apodaca* in *Ramos*. Taking with one hand what it gave with the other, the Court curtails *Ramos*'s effects by expunging *Teague*'s provision for watershed rules. And so too the Court limits the consequences of any similarly fundamental change in criminal procedure that may emerge in the future. For the first time in many decades

(since long before *Teague*, see *supra*, at 3, n. 2), those con-
victed under rules found not to produce fair and reliable
verdicts will be left without recourse in federal courts.[8]

I would not discard *Teague*'s watershed exception and so
keep those unfairly convicted people from getting new tri-
als. Instead, I would accept the consequences of last Term's
holding in *Ramos*. A decision like that comes with a prom-
ise, or at any rate should. If the right to a unanimous jury
is so fundamental—if a verdict rendered by a divided jury
is "no verdict at all"—then Thedrick Edwards should not
spend his life behind bars over two jurors' opposition. I re-
spectfully dissent.

---

[8] The majority's final claim is that it is properly immune from this crit-
icism—that I cannot "turn around and impugn" its ruling—because
"criminal defendants as a group are better off under *Ramos* and today's
decision, taken together, than they would have been if [my] dissenting
view had prevailed in *Ramos*." *Ante*, at 19. The suggestion is surprising.
It treats judging as scorekeeping—and more, as scorekeeping about how
much our decisions, or the aggregate of them, benefit a particular kind
of party. I see the matter differently. Judges should take cases one at a
time, and do their best in each to apply the relevant legal rules. And
when judges err, others should point out where they went astray. No one
gets to bank capital for future cases; no one's past decisions insulate
them from criticism. The focus always is, or should be, getting the case
before us right.